[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-13084

_____

D. C. Docket No. 01-01779-CV-T-17-EAJ

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 14, 2003
THOMAS K. KAHN
CLERK

KEVIN O'HALLORAN, as Chapter 11 Trustee for
Greater Ministries International, Inc., et al.,
WILLIAM C. SMITH, JOHN TINGUE, individuals
suing on behalf of themselves and all persons similarly
situated,

Plaintiffs-Appellants,

versus

FIRST UNION NATIONAL BANK OF FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida.

_____

(November 14, 2003)

Before TJOFLAT, ANDERSON and CUDAHY[*], Circuit Judges.

CUDAHY, Circuit Judge:

---

[*] Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Through the 1980s and 1990s, Greater Ministries International, Inc., operated out of Tampa, Florida, a vast Ponzi scheme alternatively called the "Double-Your-Blessings" program, the "Greater Trust Gift Exchange" and the "Faith Promise Plan," bilking more than 15,000 investors of an estimated $500 million. Greater Ministries maintained some of the proceeds of these illegal operations in an account with First Union National Bank of Florida. In this action, the trustee in bankruptcy of Greater Ministries and two individual investors in the Ponzi scheme are suing First Union for knowingly paying out funds from Greater Ministries' accounts to a malfeasant church official. While we agree with the district court that the plaintiffs' complaint fails as a matter of law, we vacate the dismissal and remand the case, with instructions to allow the plaintiffs leave to amend their complaint.

I.

Because this case was dismissed on a Fed. R. Civ. P. 12(b)(6) motion, we must accept the facts as alleged in the plaintiffs' First Amended Complaint and construe all inferences in the light most favorable to the plaintiffs. *Franklin v. Gwinnett County Pub. Schs.*, 911 F.2d 617, 619 (11th Cir. 1990).

During the 1980s and 1990s, Greater Ministries International, Inc., later known as Greater Ministries Church, purported to operate a church in Tampa, Florida. While Greater Ministries may have conducted services and engaged in charitable activities, its significance was largely as a vehicle for a Ponzi scheme run by the church's elders. Called at various times the "Double-Your-Blessings" program, the "Greater Trust Gift Exchange" and the "Faith Promise Plan," this "investment program" lured prospective investors with spectacular returns. In its initial phase, the church offered each investor a 100% return if that investor successfully solicited two others to commit funds equal to the amount invested by the original investor–a classic pyramid scheme. Later, investors did not even need to do the soliciting, but needed only to wait while Greater Ministries solicited enough other investors to produce the 100% return promised to be available within seventeen months. The investment interests were labeled "gifts," the profits called "God's blessings" and the reinvesting or rolling over of proceeds "regifting." The programs were administered by entities such as "Greater Trust" and "1 John 4:4, Inc.,"[1] and sold through a national network of "elders," who received as much as a 5% commission on investment funds secured through their efforts. According to the plaintiffs, Greater Ministries managed to defraud more than 15,000 victims out

---

[1]"Little children, you are of God, and have overcome them; for he who is in you is greater than he who is in the world." 1 *John* 4:4 (Revised Standard).

of an estimated total of $500 million.

The investors' funds were funneled by Greater Ministries into a single general fund, where they were allegedly commingled with other, non-Ponzi revenues. From 1995 to 1998, Greater Ministries used several bank accounts, one of the principal ones being a First Union National Bank of Florida account having the account number 2090001418036 (the "8036 Account").[2] It is this account which lies at the heart of this lawsuit.

During the period that Greater Ministries maintained accounts at First Union, the bank had actual knowledge of Greater Ministries' illegal activities but "utterly ignored" them in its "desire to make money for itself off the Ponzi and money laundering scheme money flowing through its accounts." First Am. Compl. at 14 para. 15, Record at 16. According to the plaintiffs, this knowledge came from numerous Tampa Tribune articles about investigations by various states into Greater Ministries, from knowledge of the criminal histories of various Greater Ministries officials and from a state investigation into an attempt by Greater Ministries-related individuals to acquire control of First Western Bank (another Florida bank). Other clues about the illegal nature of Greater Ministries were Florida's shutting down of Greater Assurance Trust (Greater Ministries' foray into

---

[2]First Union completed a merger with Wachovia Corporation in September 2001.

the insurance business, an entity that also had an account with First Union) and advisories issued by the Treasury Department and the Federal Deposit Insurance Corporation regarding the illegality of an entity operated by Greater Ministries named Greater International Bank of Nauru. Further indicators arose from contact between First Union and various individual investors as well as from the suspiciously large transactions involving the account. According to the plaintiffs, several other banks had refused to continue doing business with Greater Ministries and had told it to take its business elsewhere. In contrast, First Union knew of Greater Ministries' misdeeds, consulted with government officials about them and even notified Greater Ministries that its accounts were being closed, but continued to service the Greater Ministries accounts.

Between August and November 1998, First Union allowed Payne to withdraw about six million dollars from the Greater Ministries accounts. For example, on August 25, 1998, Payne took delivery of $2,892,900 in $100 bills from the 8036 Account. On September 1, Payne withdrew an additional $1,886,250. In order to legitimize the withdrawals, First Union "induced the Paynes" to present documentation "as ostensible authorization" for the cash deliveries. *Id.* at 29 para. 29. Much of this money was never seen again by the investors or by the government. In 2001, Payne was sentenced to 27 years in

5

federal prison for fraud and other offenses. His wife was sentenced to 13 years.

As a result of the continuing criminal investigation of Greater Ministries and Payne, Greater Ministries was put into federal receivership in August 1999. Shortly thereafter, the federal receiver, with authorization from the district court, initiated an involuntary bankruptcy case against Greater Ministries, and Kevin O'Halloran, a plaintiff in the present action, was appointed trustee of the bankruptcy estate. O'Halloran, on behalf of Greater Ministries, and William C. Smith and John Tingue, two individual investors defrauded by Greater Ministries' Ponzi scheme, brought the present action. The plaintiffs alleged four different state law claims against First Union: aiding and abetting crimes and torts, assisting breach of fiduciary duties, breach of duties to warn and to control and negligence. The district court granted the defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss.

First, the district court held that O'Halloran does not have standing to bring a suit against First Union. Citing *Feltman v. Prudential Bache Securities*, 122 B.R. 466 (S.D. Fla. 1990), the court held that Greater Ministries was simply a "conduit for stolen money" with no genuine claim to the disputed funds and that any alleged injury to Greater Ministries was illusory. Second, the court found that the claims brought by the individual investors, who do have standing, failed as a matter of

6

law.  The court reasoned that, under Florida law, First Union had no duty to the individual investor plaintiffs; the bank's only obligations were to Greater Ministries, its depositor.  The district court reasoned that recognizing a duty to the individuals here would require banks to intrude significantly into the affairs of their clients.  The district judge ruled that even actual knowledge of Greater Ministries' misdeeds would not activate a duty by First Union to the investors in the absence of a fiduciary relationship.

## II.

We review de novo a Fed. R. Civ. P. 12(b)(6) dismissal.  *Long v. Satz*, 181 F.3d 1275, 1278 (11th Cir. 1999).  In reviewing the sufficiency of a complaint, we accept as true the facts alleged and construe them in the light most favorable to the plaintiffs.  *Franklin v. Gwinnett County Pub. Schs.*, 911 F.2d 617, 619 (11th Cir. 1990).  A complaint should not be dismissed for failure to state a claim unless "the plaintiff can prove no set of facts that would entitle him to relief."  *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002).

We begin by identifying what exactly are the torts alleged here.  The plaintiffs' principal allegations seem to deal directly with the disbursement of over

$6 million by First Union to Payne. This "embezzlement claim" takes a prominent place in the complaint. Much of the rest of the complaint, however, does not deal so much with these final withdrawals by Payne as with the underlying fraud, the deceptive solicitation of investments engaged in by Greater Ministries and Payne. This "Ponzi claim" is arguably contained within the language of the complaint. *See* First Am. Compl. at 38 para. 45, Record at 16 ("First Union breached its obligation to disclose to the Plaintiffs . . . what it knew.").

Lack of clarity about whether the plaintiffs were pursuing the embezzlement claim or the Ponzi claim, or both, has apparently plagued this lawsuit from the filing of the initial complaint. Fortunately, this question was definitively settled during oral argument:

> Appellants: The trustee is not suing to collect for the Ponzi scheme damage. There indeed is a separate lawsuit that's going to trial . . . for that.
> . . .
> Appellants: We all believe that the ownership of the [Ponzi] claim against Payne would be primarily the investors', and they do have that case . . . .
> . . .
> Anderson, J.: That's really the only claim, that six million, with respect to which you really have a claim, is it not?
> Appellants: I agree. In this case, that is the only thing we're looking for. The rest of it was window dressing.

Also during oral argument, counsel for the Appellants acknowledged that it was a

8

mistake to include in the complaint so many allegations about the underlying Ponzi scheme, and that the investors were added as parties in the present case solely in case a question arose as to the trustee's standing. In the words of Appellants' counsel, if we find the trustee to have standing, the investors "are out" of the case.

We therefore first consider whether O'Halloran has standing to pursue the embezzlement claim against First Union. Then, we consider whether the complaint validly states a claim upon which relief can be granted.

## A.

"The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. To satisfy the 'case or controversy' requirement of Article III, which is the irreducible constitutional minimum of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal quotation marks and citations omitted). A bankruptcy trustee stands in the shoes of the debtor and has standing to bring any suit that the debtor could have instituted had it not been thrown into bankruptcy. 11 U.S.C. §§ 541-42.

9

First Union won dismissal of O'Halloran's claims on the ground that O'Halloran, as trustee of Greater Ministries, did not have standing to sue First Union on any of the stated causes of action.[3] First Union continues to argue that O'Halloran cannot recover because any financial detriment that Greater Ministries might have suffered because of the bank's actions would have involved funds that Greater Ministries had acquired through fraud. The bank appears to be invoking the doctrine of in pari delicto. Def.'s Memo. of Law in Supp. of Mot. to Dismiss at 5, Record at 20 (arguing that the trustee "should not now be permitted to sue third parties to seek redress for the consequences of the bankrupt's own pervasive wrongdoing").

We begin by noting our agreement with the trustee that he is not the right party to pursue any damages resulting from the Ponzi scheme itself. Even if phrases such as "sham corporation" or "alter ego" were never used in the complaint to describe Greater Ministries, the complaint does pervasively describe Greater Ministries as an organization run by Payne for the sole purpose of

_____

[3]It is an open question in this Circuit whether a bankruptcy trustee may under some circumstances assert creditors' claims in addition to claims of the estate. Previously, we have held, in a decision expressly limited to the specific facts of that case, that a trustee could not bring such claims. *See E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 985-87 (11th Cir. 1990). We do not elaborate on the *E.F. Hutton* holding today because the trustee limits his argument to those claims derived directly from the debtor, Greater Ministries. *See* Pls.' Response to Def.'s Mot. to Dismiss at 12, Record at 24 (specifying that the investors are asserting the investors' claims and the trustee is asserting the claims of the bankruptcy estate).

perpetrating his Ponzi scheme. *E.g.*, First Am. Compl. at 1, Record at 16 (alleging that "principals of a so-called 'church' . . . operat[ed] a Ponzi scheme under a cloak of religion"); *id.* at 12 para. 11 (noting that the board of Greater Ministries was "under the ultimate control of Gerald Payne"); *id.* at 13 para. 13 (Greater Ministries was formed "for the *purported* purpose of providing a vehicle for the operation of a Christian church." (emphasis added)); *id.* at 21 para. 20 (using quotation marks around "church" and "church members" and noting that "there was no organized church congregation in any recognizable sense"); *id.* at 31 para. 33 (describing the investors as "victims of the Payne/[Greater Ministries] schemes"). Given these allegations, there is little doubt that the complaint alleges Greater Ministries to be one of the principal culprits in the Ponzi scheme. Thus, neither Greater Ministries nor its bankruptcy trustee can sue anyone, including the defendant, for the Ponzi scheme torts. Greater Ministries, whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated.[4] The trustee is correct in not pursuing such a

---

[4]We have previously found that a trustee has standing to sue on behalf of a corporation even when the debtor entity was the wrongdoer. *See, e.g.*, *Miller v. San Sebastian Gold Mines*, 540 F.2d 807 (5th Cir. 1976); *Bailes v. Colonial Press, Inc.*, 444 F.2d 1241 (5th Cir. 1971). These cases, however, have been limited to circumstances when the deception of earlier shareholders negatively impacted subsequent, unknowing and legitimate shareholders. In *Bailes*, for example, we found that a trustee had standing to sue because the corporation had assumed liabilities that, but for the tortious directors' misrepresentations of the corporations' liabilities and assets, it would not have assumed. 444 F.2d at 1245-46. The instant complaint alleges that every one of Greater Ministries elders was involved in the Ponzi scheme. There are no subsequent investors

11

fruitless claim.

The Ponzi scheme, however, is not the tort with which we are concerned. The complaint alleges that First Union acted wrongly when it permitted Payne to remove funds from the accounts Greater Ministries maintained at First Union. *E.g.*, *id.* at 34 para. 37 ("By its actions First Union . . . aided and abetted Gerald Payne . . . in wrongfully taking . . . the funds carried in accounts of Greater Ministries. . . . In addition . . . , First Union breached its obligation to disclose to the Plaintiffs . . . what it was doing with Payne and what First Union knew and had learned."); *id.* at 38 para. 45 (First Union "had a duty to warn [Greater Ministries] . . . of Paynes' money transferring and money-taking activities."). As we noted above, this is the claim that is at issue here.

The district court apparently ruled that the trustee had no standing to pursue the embezzlement claim. We disagree. The district court relied in part on the potential conflict between a bankruptcy trustee and the creditors of the bankrupt. District Ct. Order at 8 (quoting *Feltman*, 122 B.R. at 473-75, and noting that

---

with an ownership stake on whose behalf the trustee could sue. *See Miller*, 540 F.2d at 809 ("[W]ere only the founding investors involved, the district court decision [that the trustee did not have standing] would be correct."). Moreover, the trustees in *Bailes* and *Miller* were not granted standing to sue third parties but to sue *the directors themselves* on behalf of the duped, subsequent shareholders. *Bailes*, 444 F.2d at 1244 (holding that the corporation had standing to bring claim on behalf of the corporation against the promoters of the deception); *Miller*, 540 F.2d at 809 (same). In the present suit, the trustee seeks to sue First Union, not the perpetrators of the scheme. Neither Greater Ministries not its estate has standing to bring a suit based on the Ponzi claim.

allowing the trustee to sue on behalf of the debtor would deprive the creditors of standing to raise the same claims). Where, as here, the trustee is litigating in concert with investors, and the trustee may be able to assert injuries not duplicative of those suffered by the investor plaintiffs, we find the concern that the trustee is somehow displacing the rights of the investors to be misplaced. *See also Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) ("[I]f in place of the receiver's actions the investors had brought a class action against the present defendants . . . , the defendants would no doubt be arguing that the action was improper because the injury was to the corporations and only derivatively to investors in the corporations."). We also find perhaps less significant than did the district court the fact that the funds which the trustee claims to be tortiously deprived of were substantially the fruit of fraud. For example, if, say, some burglar purloined money from a safe belonging to Greater Ministries, Greater Ministries or its bankruptcy trustee could pursue a claim against the burglar regardless of whether Greater Ministries had obtained the money by fraud. Greater Ministries was responsible, according to the complaint, for the Ponzi scheme, but as the holder of voidable title to the funds (as opposed to void title) was legally injured by Payne's withdrawals from the First Union accounts.[5] *See B.R.L. Equip. Rentals, Ltd. v.*

---

[5]Nor can Payne's embezzlement be imputed to Greater Ministries. *See Seidman & Seidman v. Gee*, 625 So. 2d 1, 2-3 (Fla. Dist. Ct. App. 1992) (noting that the wrongs of an individual "acting

*Seabring Marine Indus., Inc.*, 168 F.3d 413, 415-16 (11th Cir. 1999) (noting that "the possessor of property obtained via a worthless check has 'voidable' title to the property–the possessor has title, but the seller can avoid that title as against the buyer upon discovery of the fraud"); *Mazzoni Farms, Inc. v. E. I. DuPont de Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000) ("[F]raudulent inducement renders a contract voidable, not void."). Greater Ministries' ownership of the Ponzi funds can be legally asserted against parties other than the investors themselves.

We agree with the trustee that this case can be distinguished from *Feltman*, 122 B.R. 466. Although, as we noted earlier, the complaint's allegations clearly reveal Greater Ministries to be a primary culprit in the Ponzi scheme such that it does not have standing to sue for any injuries resulting from that scheme, the complaint does not suggest that there was an absolute identity of interests between Payne and Greater Ministries. If, indeed, Greater Ministries were merely the alter ego of Payne, we might agree with the district court that there was also no standing for the embezzlement count–Payne could not embezzle funds from himself. *See id.* at 469 (noting that all the officers and directors, except one, of the plaintiff corporation were members of the embezzler's family). But Greater Ministries was,

_____

adversely to the corporation" are not imputed to the corporation). Since the trustee is alleging a wrong by Payne and First Union committed against Greater Ministries, the doctrine of in pari delicto is inapplicable.

14

if a criminal organization, also one with a significant membership and governing body. Reading the complaint in the light most favorable to the trustee, we cannot conclude that Greater Ministries was merely Payne's alter ego. As long as Greater Ministries was not merely Payne's alter ego, it is conceivable that Payne could have wrongfully embezzled money from the organization. The alleged injury resulting from Payne's embezzlement of the First Union funds gives Greater Ministries standing to pursue a claim against First Union for its involvement in Payne's withdrawals. *See also In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) ("First, there is no question that [the corporation] alleges it suffered a loss of $800,000 at the hands of the Defendants when they took from the corporation sums totalling that much for themselves and their family members. This alone is sufficient to sustain standing.").

## B.

What we are less certain of, however, is whether the complaint states a claim upon which relief can be granted. In essence, the trustee's argument appears to be that First Union knew Payne to have a criminal history and knew the suspect nature of Greater Ministries' dealings, yet allowed Payne to withdraw large sums of money, in cash, from accounts that were not his personal accounts. More

15

specifically, the complaint alleges that[6] 1) First Union "joined the conspiracies and wrongdoing of [Payne] . . . in wrongfully taking and misappropriating and converting the funds carried in [the General Ministries accounts]" and "breached its obligation to disclose to [Greater Ministries] what it was doing with Payne . . . and what First Union knew and had learned," 2) First Union "knowingly and/or recklessly aided and abetted [Payne] in breaching his fiduciary duties," 3) First Union breached a duty to warn Greater Ministries about Payne's actions and control the funds in the Greater Ministries accounts and 4) First Union voluntarily incurred and then negligently breached duties of care to Greater Ministries.[7] Record at 16.

As is obvious, a corporate entity cannot deal with banks directly–it relies on officers and employees, who are responsible for performing their duties in the

---

[6]The complaint's allegations pervasively include references to the Ponzi scheme and damage to Greater Ministries' investors. Since this lawsuit, according to the Appellants, only involves the embezzlement claim, we ignore such "window dressing" and focus on the relationship between First Union and Greater Ministries.

[7]At first reading, the four counts noted above appear almost identical. All four theories of recovery are based on the same set of events and involve the same damages. Teasing them apart, we draw the following distinctions in the trustee's theories. Count Two, to a large extent, is a restatement of Count One, except that it alleges the commission of a particular tort–breach of fiduciary duties–rather than "crimes and torts" generally. Count Three invokes more directly a duty on the part of First Union to notify Greater Ministries than do Counts One and Two, and also specifies that First Union should have taken active steps to prevent Payne's withdrawals. Count Four rests on a theory that, whatever duties First Union owed to Greater Ministries prior to 1998, it voluntarily undertook additional duties late in that year by helping Payne legitimize his withdrawals. We do not find that these distinctions, however, merit individualized discussion, since our holding applies equally to each count.

16

interests of the company. Conversely, a bank can only really complete transactions with natural persons and has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds. For example, if an employee is sent to the bank to make a withdrawal from the company's account and to bring the funds back to the corporate office, but instead the employee takes the money and flees to Paraguay, the bank is not responsible for the employee's actions. The bank is responsible only for making sure that the employee, at the time of the withdrawal, has the authority to make withdrawals on behalf of the accountholder entity. A bank's responsibility to a depositor may be somewhat heightened when the bank has knowledge that a particular individual ostensibly representing the depositor instead intends to cause financial injury to the depositor. Under such circumstances, the bank may be responsible for taking additional steps to ensure that the representative has complete authorization from the depositor. Nonetheless, a refusal on the part of the bank to permit a withdrawal by a duly authorized representative of a corporate accountholder would no doubt breach the bank's deposit agreement with that accountholder.

In his complaint, the trustee alleged that Greater Ministries and its board were "under the ultimate control of Gerald Payne." First Am. Compl. at 12 para. 11, Record at 16. Payne was one of three co-founders of the church, *id.* at 2 para.

17

2, and "the principal person with whom First Union dealt," *id.* at 18 para. 15. "First Union dealt directly and frequently with [Payne] for several years." *Id.* at 2 para. 2. The complaint also states that Payne was "operating under the name of Greater Ministries," *id.* at 15 para. 15(c), describes Greater Ministries as "his enterprise," *id.* at 21 para. 20, and refers to Greater Ministries' First Union bank accounts as "his banking business," *id.* at 22 para. 21. The complaint also alleges that First Union sought from Payne evidence of authorization for the cash deliveries. *Id.* at 29 para. 29. According to the trustee, these documents included a plan of transfer of assets, board resolutions, affidavits from Payne and new signature cards. Appellants' Opening Br. at 15.

Earlier, we concluded that the complaint, construed in the light most favorable to the trustee, does not allege Greater Ministries to have been Payne's alter ego. Here, however, we find that the complaint, even construed in the light most favorable to the trustee, clearly alleges that Payne was, for purposes of Greater Ministries' banking transactions with First Union, fully authorized by Greater Ministries to act on its behalf, and we agree with First Union that these allegations foreclose the possibility of the trustee's prevailing on any of his theories. Even if, as the complaint alleges, First Union had cause to be particularly cautious in the handling of Greater Ministries' accounts, the instant complaint

18

alleges that the bank met this higher standard of diligence. If indeed Payne had complete and legal authorization from Greater Ministries, as alleged by the complaint, First Union is not responsible for Payne's diverting the funds to his own purposes. Such allegations foreclose the possibility that First Union was responsible to Greater Ministries for Payne's withdrawals, and dismissal of this claim was appropriate. *See Pettigrew v. Citizens Trust Bank*, 229 B.R. 39 (N.D. Ga. 1998) (finding a bank not liable where the bank's sole contacts with the accountholder entity were the embezzlers themselves).

III.

For the foregoing reasons, we agree with the defendant that the trustee has not stated a claim upon which relief can be granted. This, however, is not the end of the case. Because the Notice of Appeal on this case was filed before Dec. 10, 2002, it is governed by *Bank v. Pitt*, 928 F.2d 1108 (11th Cir. 1991), *overruled by Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541 (11th Cir. 2002) (en banc). Under *Pitt*, district courts are required to give plaintiffs at least one opportunity to amend a complaint before the district court dismisses an action with prejudice. *Pitt*, 928 F.2d at 1112. Although such leave need not be granted where

19

amendment would be futile, and we think that the issue of futility here is close, the principles delineated in *Pitt* counsel us to err on the side of generosity to the trustee. Because a more carefully drafted complaint could conceivably state a valid claim, we VACATE the dismissal and REMAND, with instructions to allow the trustee leave to amend his complaint.