865 So.2d 543 (2003)
Lewis B. FREEMAN, as Receiver for NorthAmerican Financial Services, Inc.; and Mr. and Mrs. R.W. Abell; Mr. and Mrs. Albert F. Abelt; Jon K. Anderson; Mr. and Mrs. George S. Bennington; Jane E. Bennington; Carol Shaper Butler; Mr. and Mrs. Marvin L. Caldwell; Mr. and Mrs. Robert L. Cappeto; Mr. and Mrs. Joseph M. Coccaro; Roy Conrad; Mr. and Mrs. M.A. Dicello; Mr. and Mrs. John M. Duffy; Jerry Dyer; Mr. and Mrs. Thomas Fraser; Robert A. Gordon; Drege L. Gregory; Mr. and Mrs. William G. Grieve; Esher Hamel; Patricia J. Hotmer; Edward C. Jung; Deborah Knoeferi; Myra L. Knoeferi; Mr. and Mrs. William Lamont; Eldon D. Ledman; Mae Levaas; Mr. and Mrs. William E. Livingston; Mr. and Mrs. Leroy L. McKinney; Paul Mewborn; Paul A. Michalezka, Sr.; John D. Muzio; David S. Newman; Mr. and Mrs. Joseph F. O'Keefe; Mr. and Mrs. Carmine J. Pardo; Dorothy E. Peckman; Ernest R. Perry; Mr. and Mrs. Philip J. Poukish; Mr. and Mrs. Deward Riggs; John Ritchie; Gertrude L. Russell; Mr. and Mrs. John W. Schmitt; Bernard Shockenesse; Mr. and Mrs. George J. Skinner; Lois D. Smith; Stanley Smith; Ule A. White; Mr. and Mrs. Cyril F. Williams; Mr. and Mrs. Leigh A. Wilson; and David M. Ziegler, Appellants,
v.
DEAN WITTER REYNOLDS, INC., a Delaware Corporation; Dominick Santangelo, individually; and Cottrell, Warchol, Merchant & Rollings, a Florida Limited Liability Partnership, Appellees.
Nos. 2D01-4195, 2D01-4202.
District Court of Appeal of Florida, Second District.
December 19, 2003.
*544 Michael R. Josephs and Erin E. Dardis of Josephs, Jack, Miranda, McCullough & McKeown, P.A., Miami, for Appellants.
Bradford D. Kaufman, Joseph C. Coates, III, and Lorrie M. Gleim of Greenberg Traurig, P.A., West Palm Beach, for Appellees Dean Witter and Dominick Santangelo.
Albert M. Guemmer and Stephanie W. Ritt of Guemmer & Seymour, Tampa, for Appellees Cottrell, Warchol.
*545 Harley S. Tropin and Thomas A. Tucker Ronzetti of Kozyak Tropin & Throckmorton, P.A., Miami, for Amicus Curiae Florida Receivers Forum.
ALTENBERND, Chief Judge.
Lewis B. Freeman, as receiver for NorthAmerican Financial Services, Inc. (NorthAmerican), and R.W. Abell and various other individual customers of NorthAmerican appeal a final order dismissing with prejudice their amended complaint against Dean Witter Reynolds, Inc., Dominick Santangelo, and the law firm of Cottrell, Warchol, Merchant & Rollings, LLP (the Cottrell law firm). North American was incorporated by Peter Graziano and his wife, Taroll Graziano, as the centerpiece to a Ponzi scheme. In the amended complaint, the plaintiffs maintain that the three defendants had business connections with either NorthAmerican or the Grazianos that should make the defendants liable for the economic losses the corporation or its customers suffered as a result of the Ponzi scheme.
The amended complaint that the trial court dismissed with prejudice contains many legal conclusions but few specific factual allegations. It has an opening section with 87 paragraphs that are reincorporated in eight counts. The generic paragraphs are not well tailored to fit the legal theories addressed in the counts. On this court's de novo review, we have been tempted to discard all of the bath water but we fear there may be a baby hidden in some corner of the amended complaint.
The plaintiffs have conceded that counts III and VI fail to state a cause of action. As to the remaining counts, we conclude that Mr. Freeman cannot pursue these causes of action on behalf of NorthAmerican and affirm the trial court's order dismissing these counts with prejudice. However, R.W. Abell and the other customers may be able to assert individual claims against Dean Witter and Mr. Santangelo based upon aiding and abetting fraud, civil conspiracy to commit fraud, or perhaps some other theory. Although the trial court properly dismissed the customers' grouped claims as pleaded in the amended complaint, the customers should be permitted to amend the complaint to allege individual claims. If they can successfully allege individual claims, it may be necessary for the trial court to sever those claims and transfer some of them to county court. Accordingly, we reverse the trial court's order dismissing these claims with prejudice.

I. THE PONZI SCHEME AND THE CHAPTER 517 RECEIVERSHIP[1]
Peter Graziano allegedly has a long history of business failures, unsatisfied judgments, and questionable mortgage finance operations. In late 1996, he and his wife, Taroll A. Graziano, a/k/a Taroll A. Buttrum, incorporated NorthAmerican. This corporation advertised itself as a "bank alternative" where customers could deposit funds that would earn a twelve percent return. NorthAmerican represented to its customers that their money would not be pooled or become investments in NorthAmerican. It claimed that the customers' deposits would be invested in loans to third parties secured by "collateralized assets."
NorthAmerican allegedly collected more than two million dollars, typically in cashier's checks, from more than fifty customers. According to the amended complaint, the instruments were made payable to the individual customers but endorsed to NorthAmerican *546 with the understanding that the funds would be invested in mortgages. If the customers received any written contract or agreement in exchange for their cashier's checks, the agreement is not attached to the amended complaint or described in the allegations. Although the amended complaint describes these customers as "investors" in NorthAmerican, they did not purchase any equity interest in NorthAmerican. Thus the relationship alleged appears to be more accurately described as a debtor/creditor relationship. We refer to the victims of the Ponzi scheme as "customers" because it is a neutral term.
NorthAmerican did not invest the money as promised. Like most Ponzi schemes, it initially made a few legitimate investments to give credibility to the scheme. Then its earliest customers were paid the promised twelve percent interest income from the funds received from later customers. The Grazianos used NorthAmerican as a front to siphon off funds for their personal use. It appears that this scheme was successful for only a year. Then, like all Ponzi schemes, NorthAmerican collapsed. By the end, virtually all of the assets of the Ponzi scheme were gone.
In January 1998, Robert F. Milligan, as comptroller and head of the State of Florida, Department of Banking and Finance, brought an action against NorthAmerican, Peter Graziano, and Taroll A. Graziano, seeking a permanent injunction and the appointment of a receiver pursuant to section 517.191(2), Florida Statutes (1997).[2] The case was assigned to Judge Lynn Gerald. On January 7, 1998, Judge Gerald granted a temporary injunction and appointed Lewis B. Freeman as receiver for the illegal Ponzi scheme, whose principals included both Mr. and Mrs. Graziano and NorthAmerican. In November 1999, Mr. Freeman, as receiver, filed this action against Dean Witter, Mr. Santangelo, and the Cottrell law firm. This lawsuit was also assigned to Judge Gerald's division.
The defendants moved to dismiss this initial lawsuit, arguing in part that the receiver lacked standing to pursue these claims. Judge Gerald granted the motions to dismiss with leave to amend. Mr. Freeman then filed an extensively amended complaint. The amended complaint added the individual customers as plaintiffs, apparently in an effort to avoid the issue of the receiver's standing, and also added new legal theories. It is this amended complaint that we address.

II. THE AMENDED COMPLAINT AND THE ROLE OF THE DEFENDANTS
It should be emphasized that the plaintiffs do not allege the defendants were participants or principals in this Ponzi scheme. The defendants provided financial *547 or legal services either to the Grazianos or NorthAmerican under circumstances where they allegedly knew or should have known that the Grazianos were operating a Ponzi scheme. To a large extent, the plaintiffs argue that the normal services provided by these defendants for ordinary and usual compensation made it easier for the Grazianos to swindle money from the customers. The plaintiffs maintain that each of these defendants had a legal obligation to take steps to prevent the economic losses resulting from the Ponzi scheme, and that these plaintiffs possess causes of action against the defendants to enforce this legal obligation.
It is also worth emphasizing that Mr. Freeman does not maintain that these defendants received unearned moneys from NorthAmerican or that they were the direct beneficiaries of fraudulent transfers. The complaint acknowledges that the defendants provided services to NorthAmerican or the Grazianos and does not allege any wrongdoing in the fees charged to the corporation. Mr. Freeman has not attempted to allege any statutory cause of action but is seeking to allege common law theories to recover damages on behalf of the corporation. The recovery of these damages would create corporate assets that could be distributed to the customers to reimburse them for their losses.
As to the Cottrell law firm, the allegations in the amended complaint are more conclusory than factual. This law firm represented the Grazianos prior to 1997. Mr. Freeman alleges that the law firm knew or should have known about the Grazianos' prior questionable mortgage finance operations. The Cottrell law firm allegedly helped create NorthAmerican and served as its corporate counsel. It is undisputed that the corporation was owned and controlled by the Grazianos. NorthAmerican did not have additional stockholders or a board of directors. The plaintiffs maintain that the Cottrell law firm knew or should have known that the Grazianos were using NorthAmerican as an instrument to further the Ponzi scheme and that the law firm had a duty to disclose this fact to their client, NorthAmerican. However, the plaintiffs never identify an honest person within the corporation to whom the law firm could have reported this concern. The customers did not sue the law firm. Only the receiver sued the Cottrell law firm.
As to Dean Witter and Mr. Santangelo, the allegations are more extensive. According to the amended complaint, in the spring of 1997, Mr. Santangelo, an employee of Dean Witter, approached NorthAmerican in hopes that the corporation would set up accounts with Dean Witter. NorthAmerican became a customer of Dean Witter with a money market account, including check writing and charge card privileges, and with a stock and margin account. The amended complaint alleges Dean Witter and Mr. Santangelo knew that NorthAmerican promised its customers that their funds would be placed in investments secured by collateralized assets. According to the plaintiffs, Mr. Santangelo personally picked up some of the customers' cashier's checks at the offices of NorthAmerican and delivered them to the Dean Witter office for deposit into the money market account. The plaintiffs claim Dean Witter and Mr. Santangelo knew or should have known that these and other deposits into NorthAmerican's accounts violated the promises NorthAmerican was making to its customers. The plaintiffs further claim that Dean Witter and Mr. Santangelo knew or should have known that NorthAmerican was writing checks and making credit card purchases for the benefit of its principals from these accounts and that such activity was not consistent with the agreement that NorthAmerican *548 had with its customers. The amended complaint claims that Dean Witter and Mr. Santangelo had an obligation to investigate these circumstances and prevent the losses suffered by NorthAmerican and its customers.
According to Dean Witter's 1997 annual summary statement of the NorthAmerican account, NorthAmerican deposited $1,602,678.61 into its account between April 28, 1997, and December 26, 1997. By the end of 1997, only $66,441.39 remained. If NorthAmerican had accounts with other institutions, they are not described in the amended complaint, although the receivership orders reference accounts at Barnett Bank and First Union Bank.
The amended complaint attempts to allege eight causes of action based upon these general allegations. In count I, Mr. Freeman, as receiver of NorthAmerican, and the customers seek damages from Dean Witter and Mr. Santangelo for aiding and abetting fraud. In count II, the receiver and the customers seek damages from Dean Witter and Mr. Santangelo for aiding and abetting the Grazianos' breaches of fiduciary duties owed to NorthAmerican. In count III, the receiver and the customers seek damages from Dean Witter and Mr. Santangelo for aiding and abetting the Grazianos' tortious interference with NorthAmerican's business relationships with its customers. In count IV, the receiver alone seeks damages against Dean Witter for breach of fiduciary duties allegedly owed to NorthAmerican as a result of their banking relationship. In count V, the receiver and the customers seek damages from Dean Witter and Mr. Santangelo for "civil conspiracy to commit fraudulent transfers and aiding and abetting fraudulent transfers" by the Grazianos. In count VI, the receiver and the customers seek damages from Dean Witter and Mr. Santangelo based upon a general claim of civil conspiracy. In count VII, the receiver and customers seek damages from Dean Witter for negligence in its hiring, training, and supervision of Mr. Santangelo. Finally, in count VIII the receiver alone attempts to allege a claim for legal malpractice by the Cottrell law firm in its representation of NorthAmerican.
The trial court dismissed this amended complaint with prejudice for several reasons. It concluded that the amended complaint failed to state any cause of action, that the receiver lacked standing to bring the action, and that the receiver was in pari delicto with the actions of the members of the Ponzi scheme. The plaintiffs appeal this ruling, but admit on appeal that the claims in counts III and VI do not state causes of action. We conclude that Mr. Freeman cannot pursue any of the remaining causes of action, but that the customers may be able to amend the complaint to properly assert individual claims for aiding and abetting fraud or civil conspiracy to commit fraud.

III. THE RECEIVER'S CLAIMS
We conclude that the receiver did not and cannot allege a cause of action against the defendants. Count IV fails to state a cause of action regardless of the receiver's standing in this lawsuit. As to the remaining counts, I, II, V, VII, and VIII, we conclude that NorthAmerican itself could not pursue these claims and that Mr. Freeman, as receiver, is in no better position to pursue such claims under the circumstances in this case.

A. The Receiver Fails to State a Cause of Action for Breach of a Fiduciary Duty.
In count IV, the receiver sought damages on behalf of NorthAmerican for Dean Witter's alleged breach of fiduciary *549 duties owed to NorthAmerican. The receiver theorized that Dean Witter owed fiduciary duties to NorthAmerican to make certain that funds deposited into NorthAmerican accounts "were properly used" and not diverted or looted for personal use by the Grazianos.[3] The receiver did not allege that funds were taken from these accounts by persons lacking authority to withdraw funds under the contracts establishing the accounts or that Dean Witter's actions violated its contracts with NorthAmerican.[4]
The law has generally refused to transform a banking relationship from a debtor/creditor relationship to one involving fiduciary duties. See Barnett Bank of W. Fla. v. Hooper, 498 So.2d 923 (Fla.1986). We have found no case holding that a bank breached a fiduciary duty owed to its client by failing to investigate or disclose the manner in which the client or its authorized agents used their money. In a recent federal case with many similarities to this case, the Eleventh Circuit refused to recognize a comparable theory against a bank made by a bankruptcy trustee and certain "investors" in a Ponzi scheme. See O'Halloran v. First Union Nat'I Bank of Fla., 350 F.3d 1197 at 1205 (11th Cir. 2003) (holding trustee could not prevail against bank on similar claim when representative of Ponzi scheme "embezzled" some of scheme's proceeds, stating, "[t]he bank is responsible only for making sure that the employee, at the time of the withdrawal, has the authority to make withdrawals on behalf of the account holder entity").
Under the facts of this case, Dean Witter is comparable to any other banking institution. When one establishes a bank account, the bank is obligated to deposit legal transfers into the account and to honor checks and other usual debits against the account. We would radically alter the law of banking if we required banks to review credit card accounts and checking accounts to make certain that their customers were spending their money wisely. In this case, under the receiver's theory, Dean Witter would apparently have been required to refuse to make payments that were legal on their face in order to fulfill some "fiduciary duty." We agree with the federal court that these allegations fail to state a cause of action under Florida law.[5] This is true whether *550 the account was managed by a traditional bank or a financial institution like Dean Witter. Accordingly, we affirm the dismissal of this count with prejudice.

B. The Receiver's Remaining Causes of Action Received from NorthAmerican Suffer Due to the Nature of this Ponzi Scheme.
Mr. Freeman's ability to pursue the remaining counts is not affected so much by the doctrine of in pari delicto as it is by the factual history of this Ponzi scheme. It is axiomatic that Mr. Freeman as a receiver obtained the rights of action and remedies that were possessed by the person or corporation in receivership. See Hamilton v. Flowers, 134 Fla. 328, 183 So. 811 (1938); State of Fla., Dep't of Ins. v. Blackburn, 633 So.2d 521 (Fla. 2d DCA 1994); O'Neal v. Gen. Motors Corp., 841 F.Supp. 391 (M.D.Fla.1993); 44 Fla. Jur.2d Receivers § 95 (1996); 65 Am. Jur.2d Receivers § 100 (2001). Although a receivership is typically created to protect the rights of creditors, the receiver is not the class representative for creditors and receives no general assignment of rights from the creditors. Thus, the receiver can bring actions previously owned by the party in receivership for the benefit of the creditors, but he or she cannot pursue claims owned directly by the creditors. See McHale v. Huff, 109 B.R. 506 (Bankr. S.D.Fla.1989).[6]
Although a receiver receives his or her claims from the entities in receivership, a receiver does not always inherit the sins of his predecessors. Under certain circumstances, defenses such as unclean hands do not apply against a receiver when they would have applied against the entity that was placed into receivership. 65 Am. Jur.2d Receivers § 372. (2001). We are inclined to believe that the receiver may also pursue certain claims that would be barred by the defense of in pari delicto if pursued by the corporation that was placed in receivership. See Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir.1995).
Neither party to this appeal seriously disputes these general legal principles. The application of these general principles to the allegations of the amended complaint is, however, extensively briefed and disputed. Unfortunately, the case law on this subject is not entirely clear, and no single case is dispositive.
On one hand, there are cases that emphasize that the corporation is not human and that the sins of its principals do not transfer to the corporation. Perhaps the most eloquent statement of this position is Judge Posner's description in Scholes. He states that the corporation in such a Ponzi scheme is a mere "robotic tool" or "evil zombie" of the principal. 56 F.3d at 754. Once the receiver takes over, the corporation is freed from its spell and returned to good citizenship. It can then sue to recover its losses. Thus in Scholes, the Seventh Circuit permitted a receiver to sue the *551 Ponzi scheme's principals and the recipients of fraudulent transfers of the corporation's assets. See also Schacht v. Brown, 711 F.2d 1343 (7th Cir.1983) (permitting state director of insurance, as statutory liquidator of insurer, to maintain RICO action against officers and directors that looted insurer of income and its most profitable business).
In Feltman v. Prudential Bache Securities, 122 B.R. 466 (S.D.Fla.1990), however, Judge Nesbitt took a less forgiving approach. She described a sham corporation created for such a Ponzi scheme as an "alter ego with no corporate identity separate from the [principal]." 122 B.R. at 473. As a result, Judge Nesbitt was unwilling to permit a bankruptcy trustee to pursue claims analogous to the claims in this proceeding, including claims for aiding and abetting theft, negligence, and participation in a breach of fiduciary duty. Id. at 469, 475.
In attempting to reconcile these cases, we believe it is helpful to differentiate between two types of claims that may arise in this context. First, there are actions that the corporation, which has been "cleansed" through receivership, may bring directly against the principals or the recipients of fraudulent transfers of corporate funds to recover assets rightfully belonging to the corporation and taken prior to the receivership. This was the case in Scholes and Schacht. Distinct from these claims, however, are common law tort claims against third parties to recover damages in the name or shoes of the corporation for the fraud perpetrated by the corporation's insiders. These are the types of claims barred in Feltman. When the entities in receivership do not include a corporation that has at least one honest member of the board of directors or an innocent stockholder, we do not perceive a method to separate the fraud and intentional torts of the insiders from those of the corporation itself.
By way of explanation, we note that Mr. Freeman is the receiver for the Grazianos as well as NorthAmerican. He has not brought any claims against these defendants as receiver for the Grazianos. The reason for this is obvious: the Grazianos are the insiders who actually committed the fraud and the thefts. They suffered no economic losses. As intentional tortfeasors, they clearly are not entitled to contribution from these defendants for the damages that they rightfully owe to the customers. See § 768.31(2)(c), Fla. Stat. (1997). Thus, in order to allege a common law tort against these defendants, it is incumbent upon Mr. Freeman to establish that NorthAmerican is separate and distinct from these intentional tortfeasors.
Although the receivership may "cleanse" the corporation, it cannot alter historical facts. In this case, NorthAmerican was controlled exclusively by persons engaging in its fraudulent scheme and benefitting from it. NorthAmerican was not a large corporation with an honest board of directors and multiple shareholders, suffering from the criminal acts of a few rogue employees in a regional office. It is clear from the allegations of the amended complaint that it was created by the Grazianos to dupe the customers. This corporation was entirely the robot or the evil zombie of the corporate insiders.
In O'Halloran, the bankruptcy trustee did not attempt to allege comparable causes of action related to a similar Ponzi scheme. The Eleventh Circuit agreed that the "trustee is not the right party to pursue any damages resulting from the Ponzi scheme itself." O'Halloran, 350 F.3d at 1202. As it explained in a footnote, earlier cases allowing corporations to pursue claims had involved corporations that had innocent stockholders. Id. at 1203 n. 4. *552 The corporation, "whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated." Id. at 1203.
The distinction between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which cannot pursue such claims, is both a legal and a practical distinction. Given that we have already ruled that Dean Witter had no fiduciary duty to NorthAmerican arising from the money market account, any aiding and abetting of other intentional torts would need to involve conduct beyond Dean Witter's normal banking operations. Merely conducting normal, lawful banking operations for the corporation is not enough to establish aiding and abetting an intentional tort against the corporation; the receiver needed to establish that these defendants had a duty owed to NorthAmerican to disclose the misconduct of the Grazianos to NorthAmerican as a separate corporate entity.
Accordingly, the receiver's legal theories on behalf of the corporation hinge on a duty by the defendant to disclose matters to NorthAmerican. In count I, Dean Witter and Mr. Santangelo allegedly aided and abetted the Grazianos in their action to defraud NorthAmerican either by normal banking activity or by failing to disclose misconduct to NorthAmerican. In count II, these defendants allegedly aided and abetted a breach of fiduciary duties owing from the Grazianos to NorthAmerican in the same manner. In count V, they conspired to commit or aided and abetted fraudulent transfers by the Grazianos from NorthAmerican in the same manner.[7] Even count VII for negligence, as it relates to NorthAmerican, ultimately depends upon some duty by Mr. Santangelo to perform acts to disclose to NorthAmerican the misconduct of the Grazianos.
Once the lawful banking activities are removed from the complaint, all of these theories depend on some duty by the defendants to blow the whistle on the Grazianos by disclosing these matters to NorthAmerican. The receiver may have freed NorthAmerican from the spell of the Grazianos when he was appointed, but the historical fact remains that NorthAmerican was the robot or zombie of the Grazianos at all times relevant to the allegations in the amended complaint. As a result, a theory based on a duty to disclose misconduct to that corporation during a time prior to the receivership simply cannot stand because no honest person existed within the corporation to whom such conduct could be reported. The receiver has not alleged any common law theory that would have required a report by these defendants to any third party.
Mr. Freeman admits that the legislature has created no statutory claim that he can pursue against these defendants and that the various regulatory laws create no private right of action in this case. We are hesitant to create nebulous common law theories in this context when the legislature *553 has not chosen to create more specific and certain duties. In the end, the damages suffered in this case were suffered by the individual customers and not by a corporation created and controlled by the Grazianos. It is those individual customers who may have rights to pursue a claim against Dean Witter and Mr. Santangelo for those damages.
Along these lines, to the extent that count I discusses Dean Witter or Santangelo's aiding and abetting a fraud by NorthAmerican and the Grazianos upon its customers and to the extent that count V discusses their engaging in a conspiracy to commit or to aid and abet fraudulent transfers to the detriment of the customers, we agree with the trial court that such causes of action are possessed by the individual customers and are not matters that could possibly have been assigned to Mr. Freeman by NorthAmerican in this receivership. The customers were not parties to the receivership and have not assigned their claims to Mr. Freeman. Thus, he has no "standing" to bring these claims because he does not possess them. We address those claims in the next section of this opinion.
As to count VIII against the Cottrell law firm, we conclude that this claim also relies upon an alleged duty of the law firm to disclose to the corporation the Grazianos' wrongdoing. For the same reasons that the claims by the receiver against Dean Witter and Mr. Santangelo fail, this claim also fails. At all relevant times, there was no one within the corporation to whom the law firm could report misconduct to change or alter this scheme. The receiver does not allege any basis to conclude that the law firm had a legal obligation to report matters to a regulatory agency or to law enforcement. We therefore affirm the trial court's dismissal of each of the receiver's claims with prejudice.

IV. THE CUSTOMERS' CLAIMS AGAINST DEAN WITTER AND MR. SANTANGELO
The amended complaint added various customers as additional plaintiffs primarily to overcome issues of the receiver's standing that were troubling to the trial court. Our preceding analysis leaves pending counts I, II, V, and VII as brought by the individual customers.
The amended pleading on behalf of the customers suffers from serious deficiencies. As to each of the numerous individual parties, the complaint alleges: "Plaintiff [X] is a resident of [Y], is sui juris and invested funds with NorthAmerican in Lee County, Florida, which funds, or a portion thereof, were lost due to the wrongs complained of herein." The complaint never alleges how much was invested or lost by these individuals. It never alleges that the individuals each lost an amount of money that would invoke the jurisdiction of the court. It never alleges when or under what circumstances the individual transactions occurred. None of these plaintiffs allege that they had any personal contact with Dean Witter or Mr. Santangelo, that they relied on representations made by these defendants, that their individual checks were transported by Mr. Santangelo from NorthAmerican to Dean Witter, or that their individual checks were knowingly or fraudulently commingled by Dean Witter. Instead, the amended complaint attempts to add these numerous plaintiffs as some type of unified, collective plaintiff seeking collective damages for a collective wrong.
This case is not a class action, and there is no basis to permit this kind of collective pleading. As a collective pleading, it cannot be amended to state a cause of action. On the other hand, if one accepts as true the broadest statements in the amended *554 complaint, one or more of the individual plaintiffs may be able to allege a fact-specific claim against Dean Witter or Mr. Santangelo. On the basis of the current record, we cannot foreclose an action by each of these individual customers if they can allege that Dean Witter or Mr. Santangelo made a fraudulent or negligent misrepresentation to them personally, or perhaps if they can allege that Dean Witter and Mr. Santangelo had some specific role in their individual transaction under circumstances where Dean Witter or Mr. Santangelo knew that the individual customer was being defrauded and actively participated in that fraud. Thus counts I and V may be amended to state a cause of action by some of the individual customers based upon theories of fraud. As to count V, however, we note that whether the specific cause of action for aiding and abetting a fraudulent transfer exists will depend upon the Florida Supreme Court's pending decision in Freeman v. First Union National Bank, No. SC03-896.
As to count VII, the count alleging that Dean Witter was negligent in the supervision and retention of Mr. Santangelo, we are concerned that this claim for simple negligence resulting in purely economic loss may be impermissible under one of the theories collectively described as the economic loss doctrine, see Monroe v. Sarasota County Sch. Bd., 746 So.2d 530 (Fla. 2d DCA 1999), but see Am. Express Travel Related Servs. Co. v. Symbiont Software Group, 837 So.2d 434 (Fla. 3d DCA 2002), unless it can be alleged as professional malpractice claim, see Moransais v. Heathman, 744 So.2d 973 (Fla.1999). As brought by the customers, of course, such a claim also raises questions as to whether the professional owes a duty to someone other than the client. See, e.g., Angel, Cohen & Rogovin v. Oberon Inv., N.V., 512 So.2d 192 (Fla.1987). At this point, we need not decide this issue. Rather, we do not foreclose the possibility that on remand the customers may seek to amend this count in a final effort to allege a cause of action.[8]
We emphasize that what may remain of the customers' claims would be fact-specific. It is logical to assume that customers who invested at different times and under different circumstances would have varying abilities to allege claims. Based upon the Dean Witter 1997 annual summary statement that appears in our record, it appears that many of these individual claims would not be sufficient in size to invoke the jurisdiction of circuit court and that they would need to be handled individually in county court. See art. V, § 6(b), Fla. Const.; § 34.01(1)(c)(4), Fla. Stat. (1997). These claims may permit some customers to recoup a higher percentage of their losses than others. They may also create lawsuits in which the defendants would be authorized to bring third-party claims against the Grazianos, NorthAmerican, or perhaps the receivership.
It is not clear that the lawyers currently representing Mr. Freeman could file such individual claims on behalf of the customers. Thus, we understand why the trial court was hesitant to permit the parties another chance to amend these claims. However, the individuals who were represented by the attorneys for the receivership *555 in the amended complaint were never given the option to obtain separate counsel, to file an amended complaint, or to transfer their individual claims to county court. Such an initial complaint should not be dismissed without giving the customers an opportunity to amend, unless it is clear that the pleading cannot be amended to state a cause of action. See Becklund v. Fleming, 28 Fla. L. Weekly D2330 (Fla. 2d DCA Oct.10, 2003); Cent. Fla. Inv., Inc. v. Levin, 659 So.2d 492, 492 (Fla. 5th DCA 1995). Accordingly, although we agree that the trial court was authorized to dismiss the individual claims as pleaded, we reverse the dismissal of these claims with prejudice. On remand, these individual parties should be given an opportunity to attempt to plead claims that, if legally sufficient, may need to be severed or transferred to county court.
Affirmed in part, reversed in part, and remanded.
CASANUEVA and COVINGTON, JJ., concur.
NOTES
[1] Because the circuit court's order dismissed the amended complaint, the facts described in this opinion are based on the allegations in the amended complaint.
[2] Section 517.191(2) provides:

[T]he court shall have the power and jurisdiction, upon application of the department, to impound and to appoint a receiver or administrator for the property, assets, and business of the defendant, including, but not limited to, the books, records, documents, and papers appertaining thereto. Such receiver or administrator, when appointed and qualified, shall have all powers and duties as to custody, collection, administration, winding up, and liquidation of said property and business as shall from time to time be conferred upon her or him by the court. In any such action, the court may issue orders and decrees staying all pending suits and enjoining any further suits affecting the receiver's or administrator's custody or possession of the said property, assets, and business or, in its discretion, may with the consent of the presiding judge of the circuit require that all such suits be assigned to the circuit court judge appointing the said receiver or administrator.
[3] We note the customers of NorthAmerican are not claiming any fiduciary duty owed to them by Dean Witter, and they are not plaintiffs as to this count.
[4] Although the amended complaint occasionally refers to Dean Witter as a "broker/dealer," the receiver is not alleging that Dean Witter committed any of the usual claims for breaches of fiduciary duties made by clients of brokers. No one suggests that Dean Witter churned NorthAmerican's accounts or gave the corporation bad investment advice. This case centers instead on the normal deposits and withdrawals the Grazianos made from the money market account, which is comparable to a bank account. We conclude the relationship described in the amended complaint is thus a traditional banking relationship, not an investment relationship.
[5] We have not overlooked the case of Tew v. Chase Manhattan Bank, N.A., 728 F.Supp. 1551 (S.D.Fla.1990). Without approving the holding in Tew, 728 F.Supp. 1551, we note that the facts in that case are substantially different. First, Tew involved a clearing bank, a bank charged with settling corporate and government securities for its customers. That relationship is significantly more complex than the banking relationship created through typical money market and credit card transactions. Second, the district court in Tew noted that although Chase Manhattan alleged that the company which acted as a conduit for the fraud was an "engine of theft" in which the officers and directors represented all of the companies' shareholders, such allegations were unsupported by any proof and were "contrary to the facts." 728 F.Supp. at 1569. Finally, the Tew court did not distinguish between damages to the corporation versus damages to the customers of the corporation due to the fraud. The Tew court thus permitted a bankruptcy trustee to pursue claims based upon "a duty to the public's representative, the government, and to the creditors of the company," not based upon a duty owed to the company itself. 728 F.Supp. at 1567. Based upon these distinctions, we conclude Tew is not persuasive in this case.
[6] In another context, the legislature has given a receiver of an insolvent insurer the right to pursue certain claims of third parties including policyholders. See § 631.141(6), Fla. Stat. (2002). Assuming the legislature has the power to assign the claims of such third parties, it is noteworthy that this statute specifically exempts from assignment claims that are "personal and unique" and that "could not inure to the benefit of the estate." The customers' claims in this case would appear to be such personal and unique claims.
[7] We note that the supreme court is currently considering a case involving this same receiver in which it was asked by the Eleventh Circuit to determine whether a cause of action for aiding and abetting a fraudulent transfer exists in Florida. Freeman v. First Union Nat'l Bank, No. SC03-896; Freeman v. First Union Nat'l., 329 F.3d 1231 (11th Cir. 2003). Oral argument was held before the Florida Supreme Court on November 3, 2003. The Third District has rejected Mr. Freeman's argument that such a common law claim exists. See Danzas Taiwan, Ltd. v. Freeman, 28 Fla. L. Weekly D1163, ___ So.2d ___, 2003 WL 21075724 (Fla. 3d DCA May 14, 2003) (citing Bankfirst v. UBS Paine Webber, Inc., 842 So.2d 155 (Fla. 5th DCA 2003)).
[8] Of course, the customer's theory in count II alleging that Dean Witter and Mr. Santangelo aided and abetted the Grazianos' breaches of fiduciary duties owed to NorthAmerican fails for the same reason the receiver's cause of action in this count fails. It relies upon a duty to disclose wrongdoing not to the customers, but to the corporation itself. Again, the corporation was a robot or zombie of the Grazianos and there was no one within the corporation to whom this information could be effectively disclosed.