[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10448
_____

D.C. Docket No. 8:10-cv-00201-EAK-MAP

BURTON W. WIAND,
as Receiver for Valhalla Investment Partners, L.P.; Viking Fund, LLC; Viking IRA
Fund, LLC; Victory Fund, Ltd.; Victory IRA Fund, Ltd.; Scoop Real Estate, L.P.;
and Traders Investment Club,

Plaintiff-Appellee/Cross-Appellant,

versus

VERNON M. LEE,
individually and as Trustee of the VERNON M. LEE TRUST,

Defendant-Appellant/Cross-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(June 2, 2014)

Before MARTIN and ANDERSON, Circuit Judges, and FULLER,[*] District Judge.

FULLER, District Judge:

Vernon M. Lee ("Lee") individually and as Trustee of the Vernon M. Lee Trust ("the Lee Trust") (collectively, "the Lee Defendants") appeals the grant of summary judgment in favor of Burton M. Wiand ("the Receiver") on the Receiver's complaint brought pursuant to the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726.101 et seq.  The Receiver sought to void distributions of profits to the Lee Defendants from the receivership entities, which were used in perpetration of a Ponzi scheme.[1]  The Receiver appeals the denial of prejudgment interest on the profits Lee was ordered to return to the receivership entities.

After careful review and with the benefit of oral argument, we affirm the district court's grant of summary judgment in favor of the Receiver and reverse and remand the denial of prejudgment interest.

## I.  FACTS

This case is one of many "clawback" actions initiated by the Receiver to recover profits from investors in a Ponzi scheme run by Arthur Nadel ("Nadel") in order to compensate those investors who were not lucky enough to have profited

---

[*] Honorable Mark E. Fuller, United States District Judge for the Middle District of Alabama, sitting by designation.

[1] A Ponzi scheme operates by using new investors' funds to pay old investors to create the impression that the scheme is generating profits.  See United States v. Orton, 73 F.3d 331, 332 n. 2 (11th Cir. 1996).

on their investments. The Receiver brings this action on behalf of Valhalla Investment Partners, L.P. ("Valhalla Investment"), Viking Fund, LLC ("Viking Fund"), Viking IRA Fund, LLC ("Viking IRA Fund"), Victory Fund, LTD ("Victory Fund"), Victory IRA Fund, LTD ("Victory IRA Fund"), and Scoop Real Estate, L.P. ("Scoop Real Estate") (collectively, "the Hedge Funds"), as well as Traders Investment Club ("Traders").

Nadel was a hedge fund manager who induced investors to open trading accounts with the Hedge Funds based on false representations as to the funds' assets and the returns the investors would receive. Although Nadel conducted some trading activity, Nadel primarily used the principal funds of new and existing investors to benefit himself and to pay distributions to older investors in order to maintain the appearance that the Hedge Funds were generating profits through legitimate investment activities, thus enabling him to attract new investors. The scheme eventually collapsed in January 2009, and Nadel subsequently plead guilty to a fifteen-count indictment charging him with securities fraud, mail fraud, and wire fraud. On December 3, 2010, Nadel was sentenced to a 168-month sentence and ordered to pay $174,930,311.07 in restitution. Nadel died in custody on April 16, 2012.

The details of the manner in which Nadel perpetrated the Ponzi scheme are not in dispute. Nadel ultimately controlled the Hedge Funds' investments through

3

two entities that he created and controlled, Scoop Capital and Scoop Management. Nadel created and controlled Traders, an investment club separate from the Hedge Funds. From at least December 1999 through January 2009, Nadel managed the Hedge Funds and misrepresented their performance. During this time period, Nadel maintained more than 700 investor accounts and raised at least $336 million from investors. Nadel misrepresented the net asset value and net profits of the Hedge Funds and Traders through monthly statements issued to investors. The monthly statements showed appreciation and increase in the investor accounts that did not exist. Nadel used his control of the Hedge Funds' trading activity to transfer investor funds to brokerage accounts for the Hedge Funds as well as to Nadel's personal accounts. Investors' funds from the Hedge Funds and Traders were commingled among Nadel's personal accounts and then combined into a single master trading account that was used to purchase securities. Nadel then allocated completed trades to the Hedge Fund brokerage accounts and his personal accounts, typically allocating profitable trades to non-Hedge Fund accounts and unprofitable trades to the Hedge Fund accounts. Investors' funds were used to pay management fees and performance-incentive fees to Nadel based on the inflated performance and net asset value of the funds reported to the investors.

Although Nadel represented to investors that their individual accounts and the Hedge Funds as a whole were generating profits, the Hedge Funds were

insolvent as early as 2000 and remained so until January 2009, when the scheme collapsed. The Hedge Funds were funded almost entirely from investors and required continuous infusions from investors to pay redemptions to earlier investors. Nadel managed the Traders investment club in a similar manner. Nadel misrepresented the gains generated by Traders and used principal investor funds, as well as cash transferred from Hedge Fund accounts, to pay Traders' investors' redemptions. The Hedge Funds collapsed in January 2009 as a result of the funds' losses and the payment of larger management fees to Nadel based on the fabricated increasing gains of the funds.

Lee and the Lee Trust held accounts with all of the Hedge Funds and with Traders. The Lee Defendants received distributions from the Hedge Funds and Traders from late 2000 through 2008. The distributions received by the Lee Defendants during this period were $935,631.51 more than their investments.[2]

The Receiver filed a complaint on January 19, 2010, seeking the return of these "false profits" on behalf of the receivership entities in order to partially compensate those investors who suffered a net loss on their investments. The Receiver sought to void the distributions from the receivership entities to the Lee Defendants as fraudulent transfers under FUFTA. On March 23, 2012, the Receiver moved for partial summary judgment on the issue of whether Nadel

---

[2] This amount of profits includes a reduction of $133,371.09 obtained by the Receiver in a settlement with Lee's children.

5

operated the Hedge Funds as a Ponzi scheme from 1999 to January 2009 and

whether, consequently, every transfer of an asset from a Hedge Fund during that

time was made with actual intent to hinder, delay, or defraud creditors of Nadel

under FUFTA's actual fraud provision.  See Fla. Stat. § 726.105(1)(a).  The

Receiver filed another motion for summary judgment on liability against Lee under

FUFTA and on its unjust enrichment claim and also sought judgment as to

damages in the amount of $935,631.51, plus prejudgment interest.

The magistrate judge issued a thorough report and recommendation that

recommended granting summary judgment in favor of the Receiver and against the

Lee Defendants but also recommended denial of an award of prejudgment interest

to the Receiver.  The magistrate judge found that Nadel operated the Hedge Funds

and Traders as a Ponzi scheme during the time these entities made their

distributions to the Lee Defendants, and that these distributions were therefore

avoidable under FUFTA because they were made with the actual intent to defraud

creditors.  The magistrate judge recommended against an award of prejudgment

interest on the grounds that the Lee Defendants assumed the legitimacy of the

investment funds and that it would be inequitable to require them to pay more than

the amount of their false profits to the receivership entities.  The district court

adopted the magistrate judge's report and recommendation and entered final

6

judgment in favor of the Receiver and against the Lee Defendants in the amount of $935,631.51.

## II.  ANALYSIS

### A.    FUFTA

This case requires us to state whether the elements of FUFTA's actual fraud provision are satisfied in a receivership proceeding where the creditors are the receivership entities and the debtor is a person who controlled and transferred the entities' funds in furtherance of a Ponzi scheme.  The Receiver's amended complaint asserts violations of FUFTA under both its actual fraud provision, *see* Fla. Stat. § 726.105(1)(a), and its constructive fraud provision, *see* Fla. Stat. § 726.105(1)(b).  Since the magistrate judge concluded that Nadel's transfer of funds from the receivership entities to the Lee Defendants violated FUFTA's actual fraud provision, he did not reach the issue of whether the transfers also violated the constructive fraud provision.  The issue presented by this appeal is whether Nadel's transfer of receivership funds to the Lee Defendants was a transfer of "property of a debtor" as required by FUFTA and otherwise satisfies the elements of actual fraudulent intent.  *See* Fla. Stat. § 726.101(2) (defining "asset" to mean "property of a debtor").

Under FUFTA's actual fraud provision, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim

7

arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor . . . ." Fla. Stat. § 726.105(1)(a). The statute requires "[1] a creditor to be defrauded, [2] a debtor intending fraud, [3] and a conveyance of property which is applicable by law to the payment of the debt due." Johnson v. Dowell, 592 So. 2d 1194, 1196 (Fla. 2d DCA 1992). A "creditor" is "a person who has a claim," and "claim" is broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Fla. Stat. § 726.102(4), (3). A fraudulent transfer must be of an "asset," which is defined as any "property of a debtor," excluding certain narrow exceptions. Fla. Stat. § 726.102(2).

In determining whether a transfer was made with actual intent to defraud a creditor, courts look to the statutory "badges of fraud," such as whether, for example, the transfer was to an insider, the debtor retained control of the property after the transfer, the transfer was of substantially all the debtor's assets, or the debtor was insolvent or became insolvent shortly after the transfer was made. Fla. Stat. § 726.105(2)(a)–(k). See also In re Levine, 134 F.3d 1046, 1053–54 (11th Cir. 1998) (applying FUFTA's statutory badges of fraud). "The existence of badges of fraud creates a prima facie case and raises a rebuttable presumption that

the transaction is void." Gen. Elec. Co. v. Chuly Int'l, LLC, 118 So. 3d 325, 327 (Fla. 3d DCA 2013) (citation and internal quotation omitted). While "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance [] several of them when considered together may afford a basis to infer fraud." Johnson, 592 So. 2d at 1197 (citation omitted). Although FUFTA lists a number of badges of fraud, "[i]t is clear from the language of the statute that in determining intent, consideration may be given to factors other than those listed." Gen. Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1498 (11th Cir. 1997) (citation and internal quotation omitted). "Courts may take into account the circumstances surrounding the conveyance." Gen. Elec. Co., 118 So. 3d at 327 (citing Kirk v. Edinger, 380 So. 2d 1336, 1337 (Fla. 5th DCA 1980)).

In S.E.C. v. Elliott, we stated that a receiver could void the transfer of assets from the receivership entities by the person who was using them to perpetrate a Ponzi scheme under FUFTA's actual fraud provision because two of the statutory badges of fraud were present–namely, the transfer occurred two weeks before the appointment of a receiver and the debtor was insolvent. 953 F.2d 1560, 1567–68 (11th Cir. 1992). However, we stopped short of holding the transfer in question was voidable under FUFTA and remanded the case to the district court to correct procedural defects in the original order by holding an evidentiary hearing on the

transferee's objections.  Id. at 1568.  The magistrate judge cited Elliott as an example of this court's "willingness to allow a receiver to pursue FUFTA claims under substantially similar facts . . . ."  We endorse Elliott's application of FUFTA to a receiver's action to avoid a transfer of funds from the receivership entities used in a Ponzi scheme and undertake to develop Elliott by explaining how such a transfer satisfies the elements of FUFTA.

Elliott suggested that the transfers made by the perpetrator of the Ponzi scheme were made with actual intent to defraud because two of FUFTA's badges of fraud were present in the transaction in question.  953 F.2d at 1568.  Other circuits have held that in a receiver's suit under a state uniform fraudulent transfer law, proof that a transfer was made from an entity used to perpetrate a Ponzi scheme is sufficient to establish the transfer was made with actual fraudulent intent without a consideration of the badges of fraud.  See Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008) (applying California's UFTA); S.E.C. v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007) (applying Texas's UFTA); Warfield v. Byron, 436 F.3d 551, 558–59 (5th Cir. 2006) (applying Washington's UFTA); see also Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (applying Utah's UFTA).  This court has embraced the so-called "Ponzi scheme presumption" in applying the Bankruptcy Code's fraudulent transfer provisions.  Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi schemes, transfers

10

made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering the payments under [11 U.S.C.] §§ 548(a) and 544(b).") (citations omitted).  We now clarify that, under FUFTA's actual fraud provision, proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a) without the need to consider the badges of fraud.[3]  The magistrate judge was thus correct to frame the inquiry in terms of whether Nadel operated the receivership entities as a Ponzi scheme at the time he made the transfers to Lee.

The magistrate judge concluded, and the parties do not challenge, that Nadel operated the receivership entities as a Ponzi scheme.  A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors.  In re Fin. Federated Title & Trust, Inc., 309 F.3d 1325, 1327 n. 1 (11th Cir. 2002).  The entities used to perpetrate the scheme usually conduct little to no legitimate business operations.  Id.  Since Ponzi schemes do not generate profits sufficient to provide their promised returns, but rather use investor money to pay returns, they are insolvent and become more

---

[3] This holding is not inconsistent with Elliott, since one of the badges of fraud noted in that case–the Ponzi scheme operator's insolvency–is necessarily present in every Ponzi scheme.  See Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006) (noting that "a Ponzi scheme . . . is, as a matter of law, insolvent from its inception") (citing Cunningham v. Brown, 265 U.S. 1, 8 (1924) ("[Charles Ponzi] was always insolvent, and became daily more so, the more his business succeeded.  He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.")).

11

insolvent with each investor payment.  See id. at 1332 ("By definition, a Ponzi scheme is driven further into insolvency with each transaction.") (quoting In re Universal Clearing House, 60 B.R. 985, 999 (D. Utah 1986)); see also Cunningham, 265 U.S. at 7–8.

Nadel's scheme exhibited all of the marks of a Ponzi scheme.  Nadel attracted investors with promises of high returns by misrepresenting the performance of the Hedge Funds and Traders as well as their net assets.  Although Nadel conducted trading activity, he did not make legitimate investments.  Nadel commingled investor funds from the different Hedge Funds and Traders into a master trading account, then allocated the profitable trades to his personal accounts and the unprofitable trades to the Hedge Fund accounts.  Nadel used the commingled funds to pay management fees to himself and to make distributions to older investors.  The investors who profited, such as the Lee Defendants, did not receive income from their investments, but received principal funds from other investors.  The scheme required continuous infusions of new investments, which were solicited through misrepresentations of the funds' performance and falsified monthly statements to individual investors that led them to believe they were making profits on their investments.  The receivership entities were insolvent in 2000 almost immediately after they began operating in this manner in December 1999, and they remained insolvent until their collapse in 2009.  The magistrate

judge correctly concluded that the receivership entities' transfers of distributions to Lee as an investor were made in furtherance of a Ponzi scheme.

The Lee Defendants argue that the Ponzi scheme presumption should not apply to find that the distributions to them were made with actual intent to defraud as a matter of law because the transfers in question cannot satisfy the plain language of FUFTA. The Receiver proceeds under the theory that the receivership entities are creditors of Nadel and that Nadel is a debtor to the entities. Thus, as FUFTA requires, Nadel's transfers to investors must have been transfers of "property of a debtor." Fla. Stat. § 726.102(2), (10), (12). But, the Lee Defendants argue, the transfers were of the receivership entities' funds, not Nadel's funds. In other words, applying FUFTA to Nadel's transfers appears to treat the receivership entities and Nadel as simultaneously both separate and distinct entities–the receivership entities are considered distinct from Nadel in order to establish a creditor and a debtor, but they are treated as one entity in order to establish that Nadel's transfers of the entities' funds were transfers of *his* property. The court is not persuaded by these arguments.

First, an explanation of how the Receiver has standing to sue also explains how the receivership entities are creditors of Nadel for the transfers he made in perpetrating the Ponzi scheme. Judge Posner, in the leading case on the issue, addressed a receiver's standing to sue in a clawback action related to a Ponzi

13

scheme in Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995). A receiver of entities used to perpetrate a Ponzi scheme does not have standing to sue on behalf of the defrauded investors but does have standing to sue on behalf of the corporations that were injured by the Ponzi scheme operator. 56 F.3d at 753–55. Although the corporations constitute the "robotic tools" used by the Ponzi operator, they are "nevertheless in the eyes of the law separate legal entities with rights and duties." Id. at 754. The money they receive from investors should be used for their stated purpose of investing in securities, and thus the corporations are harmed when assets are transferred for an unauthorized purpose to the detriment of the defrauded investors, who are tort creditors of the corporations. Id. Although the corporations participate in the fraudulent transfers, once the Ponzi schemer is removed and the receiver is appointed, the receivership entities are no more the "evil zombies" of the Ponzi operator but are "[f]reed from his spell" and become entitled to the return of the money diverted for unauthorized purposes. Id.

Under Lehmann, the Receiver has standing to sue on behalf of the receivership entities because they were harmed by Nadel when he transferred profits to investors, such as the Lee Defendants, from the principal investments of others for the unauthorized purpose of continuing the Ponzi scheme. Although the receivership entities were the instruments of Nadel's fraud, they were distinct legal entities whose purpose was to use client funds to invest in securities, and they were

14

harmed when Nadel diverted the funds for unauthorized uses.  Applying Lehmann to FUFTA, the receivership entities became "creditors" of Nadel at the time he made the transfers of profits to Lee and others because, as FUFTA requires, they had a "claim" against Nadel.[4] They had a "claim" against Nadel because he harmed the corporations by transferring assets rightfully belonging to the corporations and their investors in breach of his fiduciary duties, and a "claim" under FUFTA includes "any right to payment" including a contingent, legal, or equitable right to payment.  Fla. Stat. § 726.102(3).  See also Cook v. Pompano Shopper, Inc., 582 So. 2d 37, 40 (Fla. 4th DCA 1991) ("A tort claimant or contingent claimant is as fully protected under the Uniform Fraudulent Transfer Act as a holder of an absolute claim.").  The receivership entities were thus creditors because they had a right to a return of the funds Nadel transferred for unauthorized purposes for the benefit of their innocent investors.  See Lehmann, 56 F.3d at 754.  The Receiver's claim thus fits within the statutory language of FUFTA, which requires the existence of a creditor and a debtor.

Second, the Lee Defendants object that Nadel's transfers of funds from the receivership entities could not have been transfers of "assets" because assets under FUFTA must be "property of a debtor," and the funds Nadel transferred were property of the corporations.  Fla. Stat. §726.102(2), (12).  This argument fails

---

[4] Under FUFTA, a "creditor" is simply "a person who has a claim."  Fla. Stat. § 726.101(4).

15

because the Receiver has demonstrated every element Florida courts require under

FUFTA, including the nature of the property constituting the asset.  The creditor

must demonstrate that "(1) there was a creditor to be defrauded; (2) a debtor

intending fraud; and (3) *a conveyance of property which could have been*

*applicable to the payment of the debt due*."  Nationsbank, N.A. v. Coastal Utils.,

Inc., 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002) (citation omitted) (emphasis

added).[5]  The third element constitutes Florida courts' criterion for when

something is the property of a debtor under FUFTA.  This element is established

because the funds that Nadel controlled and transferred to investors could have

been applied by him to pay the debt he owed to the receivership entities as a result

of his use of funds to perpetrate a Ponzi scheme.  With each transfer that Nadel

made, Nadel became a debtor of the receivership entities because he diverted the

funds from their lawful purpose in violation of his fiduciary duties and was thus

obligated to return those same funds to the entities to be used for the benefit of the

investors.  Therefore, with each transfer, Nadel diverted property that he controlled

and that could have been applicable to the debt due, namely, the very funds being

transferred.  As the Receiver states, "[T]he money transferred to the Defendants is

not only 'applicable to the payment of the debt due,' but it is the actual money that

---

[5] The first element is established by the Lehmann case, which explains how the receivership entities are creditors of Nadel even though they were the instruments by which he defrauded investors.  The second element is established by the Ponzi presumption since Nadel indisputably made the transfers to Lee in furtherance of the Ponzi scheme.

generated and deepened (in part, along with money transferred to other investors) the debt owed by Nadel to the Investment Funds. In other words, it is the exact same money that generated the debt and gave rise to the claims in this case."

Since the undisputed facts show that Nadel's transfers to the Lee Defendants satisfy all the elements of FUFTA, the district court's grant of summary judgment in favor of the Receiver is due to be affirmed as is the judgment for the Receiver and against the Lee Defendants in the amount of $935,631.51.

## B.    Prejudgment Interest

The Receiver appeals from the denial of prejudgment interest by the district court. The Receiver sought $437,734 in prejudgment interest. This amount was derived by applying Florida's statutory interest rate from the point at which the Lee Defendants received transfers from the receivership entities that were more than they invested and carried forward. The magistrate judge recommended that the Receiver be denied an award of prejudgment interest on the amounts the Lee Defendants received in excess of their principal on equitable grounds.

Since the district court exercised supplemental jurisdiction over the Receiver's FUFTA claim, Florida law on prejudgment interest applies. See Flava Works, Inc. v. City of Miami, 609 F.3d 1233, 1237 (11th Cir. 2010). A trial court's decision to refuse or reduce prejudgment interest in weighing the equities is reviewed for abuse of discretion. Blasland, Bouck & Lee, Inc. v. City of N.

17

Miami, 283 F.3d 1286, 1298 (11th Cir. 2002). Florida endorses the "loss theory" of prejudgment interest according to which prejudgment interest is "merely another element of pecuniary damages." Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 214 (Fla. 1985). "[W]hen a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." Id. at 215; see also Bosem v. Musa Holdings, Inc., 46 So. 3d 42, 44–46 (Fla. 2010) (reaffirming Argonaut's loss theory). However, "[t]his general rule is not absolute." Broward Cnty. v. Finlayson, 555 So. 2d 1211, 1213 (Fla. 1990). "[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." Flack v. Graham, 461 So. 2d 82, 84 (Fla. 1984) (quoting Bd. of Comm'rs of Jackson Cnty. v. United States, 308 U.S. 343, 352 (1939)).

In the case of Blasland, this court applied Florida law to a district court's decision to award prejudgment interest on a breach of contract claim. 283 F.3d at 1297–99. Citing State v. Hallandale, 623 So. 2d 474, 479–80 (Fla. 1993), this court considered three factors that should guide a court's discretion in deciding whether to award prejudgment interest on equitable grounds. Those factors are (1) in matters concerning government entities, whether it would be equitable to put the burden of paying interest on the public in choosing between innocent victims; (2)

18

whether it is equitable to allow an award of prejudgment interest when the delay between injury and judgment is the fault of the prevailing party; (3) whether it is equitable to award prejudgment interest to a party who could have, but failed to, mitigate its damages. Blasland, 283 F.3d at 1297. Upon a consideration of these factors, a district court may decide not to award prejudgment interest or to reduce the amount of interest. Id. at 1298 (citing Finlayson, 555 So. 2d at 1213–14 (restricting on equitable grounds accrual of prejudgment interest to the date of demand of a back pay award rather than the date the back pay accrued)).

Here, the magistrate judge stated that Florida law considers prejudgment interest an element of pecuniary damages and stated the equitable factors in Blasland that would warrant a court in departing from the general rule that prejudgment interest is to be awarded. However, the magistrate judge then stated "[t]he list is obviously illustrative as each case is different" and concluded that allowing recovery of prejudgment interest against the Lee Defendants would be inequitable because they invested in the Hedge Funds assuming their legitimacy, paying prejudgment interest would result in an award greater than the amount of their profits, and because "the Lee Defendants have suffered enough."

The court finds the magistrate judge's rationale to be an abuse of discretion because it fails to identify and apply the equitable factors considered in Blasland to the decision to deny prejudgment interest. The general observation that the Lee

19

Defendants "have suffered enough" does not explain why the Receiver is not entitled to be made whole under Florida law, which holds prejudgment interest is an element of pecuniary damages.  Further, that the Lee Defendants will be forced to pay more than the profits they received with the addition of a prejudgment interest award is not an equitable factor weighing against an award, but is a necessary consequence of the loss theory of prejudgment interest.  See Argonaut, 474 So. 2d at 214–15 (rejecting the theory according to which an award of prejudgment interest is regarded as a penalty).

The general rule is that prejudgment interest is an element of pecuniary damages, and Florida courts have awarded prejudgment interest on FUFTA claims and on unjust enrichment claims as a matter of course.[6] See Willis v. Red Reef, Inc., 921 So. 2d 681, 684–85 (Fla. 4th DCA 2006) (remanding with instructions to trial court to calculate prejudgment interest due on damages awarded for FUFTA claim); Montage Grp., Ltd.v. Athle-Tech Computer Sys., Inc., 889 So. 2d 180, 199 (Fla. 2d DCA 2004) (reversing trial court for failure to award prejudgment interest on unjust enrichment award); Mansolillo v. Parties by Lynn, Inc., 753 So. 2d 637,

---

[6] The Receiver moved for summary judgment on its FUFTA claim, or, in the alternative, on an unjust enrichment claim.  The magistrate judge's report and recommendation did not reach the unjust enrichment claim, and the district court accordingly granted summary judgment in favor of the Receiver only as to the claim for fraudulent transfer with actual intent to defraud in Count I of the Receiver's complaint.  The court includes Florida cases awarding prejudgment interest for unjust enrichment because it is an analogous claim to a FUFTA violation.  See In re Agric. Research & Tech. Grp., Inc., 916 F.2d 528, 541–42 (9th Cir. 1990) (applying Hawaii law on prejudgment interest for conversion claims as a basis for determining when interest began to accrue on fraudulent transfers under Bankruptcy Code).

640 (Fla. 3d DCA 2000) (stating that, on a FUFTA claim, "Once the loss is fixed as of [a] specific date, prejudgment interest is to be added to that amount."); Burr v. Norris, 667 So. 2d 424, 426 (Fla. 2d DCA 1996) (reversing and remanding with instructions to trial court to award prejudgment interest on unjust enrichment award).  See also Donell, 533 F.3d at 772 ("Once the district court has identified the avoidable transfers [under California's UFTA], it has the discretion to permit the receiver to recover pre-judgment interest on the fraudulent transfers from the date each transfer was made . . . [P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money.") (internal quotation and citations omitted).  Upon remand, the magistrate judge must cite specific equitable considerations recognized under Florida law that would result in a different outcome than the cases cited above.

## III.  CONCLUSION

For the reasons above, we **AFFIRM** the district court's order granting summary judgment in favor of the Receiver and **REVERSE** and **REMAND** with instructions for the court to apply the factors in Blasland to determine whether equitable considerations justify denying or reducing a prejudgment interest award in light of Florida's general rule that prejudgment interest is an element of pecuniary damages.

21