[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13658

_____

BURTON W. WIAND,
not individually but solely in his capacity as
Receiver for Oasis International Group,
Limited, *et al.*,

                                                Plaintiff-Appellant,

*versus*

ATC BROKERS LTD.,
DAVID MANOUKIAN,
SPOTEX LLC,

                                                Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cv-01317-MSS-AAS

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and MARCUS, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a receiver appointed in the wake of a Ponzi scheme has standing to maintain fraudulent-transfer and common-law tort claims against alleged accomplices. Oasis was a $78 million Ponzi scheme masquerading as a foreign currency investment fund. After the scheme collapsed, the district court appointed Burton Wiand as equity receiver to recover assets for the benefit of the investor-victims. Wiand sued ATC Brokers, Ltd., where Oasis held accounts to trade in currency markets; David Manoukian, the owner of ATC Brokers; and Spotex LLC, which provided the software Oasis used to show investors fraudulent returns. Wiand alleged common-law tort claims against the defendants and fraudulent-transfer claims against ATC Brokers only. The district court dismissed Wiand's complaint with prejudice. It ruled that Wiand lacked standing to sue ATC Brokers and Manoukian and that Spotex was immune under the Communications Decency Act. We conclude that the district court erred in dismissing the fraudulent-transfer claims for lack of standing. And although the district court correctly concluded that Wiand lacked standing to maintain the tort claims, it erred in dismissing those

claims with prejudice and should not have reached the issue of statutory immunity. We reverse the dismissal of the fraudulent-transfer claims and remand for further proceedings, and we vacate the dismissal with prejudice of the tort claims and remand with instructions to dismiss without prejudice.

## I. BACKGROUND

This appeal is ancillary to a series of civil and criminal actions brought by the Commodity Futures Trading Commission and the Department of Justice against the Oasis Ponzi scheme. Oasis held itself out as a foreign-exchange or "forex" investment company that profited from trading currency futures. It raised $78 million from over 700 investors and, like all Ponzis, failed to invest those funds as promised. Oasis concealed $20 million of trading losses, misappropriated $10 million to pay its principals, and paid out $28 million in fictitious returns to early investors, leaving later ones with nothing. We accept the factual allegations of Wiand's complaint as true and construe them in his favor. *See Isaiah v. JPMorgan Chase Bank, N.A.*, 960 F.3d 1296, 1301–02 (11th Cir. 2020).

The Oasis Ponzi scheme was comprised of corporate entities including Oasis International Group, Ltd., Oasis Management, LLC, Satellite Holdings Co., Oasis Global FX, Ltd., and Oasis Global FX, S.A., and individuals including Michael DaCorta, Joseph Anile, Raymond Montie, and John Haas. Oasis solicited funds from investors through various fraudulent offerings that promised high rates of return. A minority of the Oasis International Group common stock—less than 10 percent—was owned by innocent

shareholders from the entity's formation. Oasis also issued nonvoting preferred shares guaranteeing a 12 percent annual return and fraudulent promissory notes to shareholders and creditors.

The Ponzi schemers operated the various Oasis corporate entities as "one common enterprise." DaCorta, Anile, and Montie owned, controlled, and served as the board of directors of Oasis International Group, "the principal entity used to perpetrate the Ponzi scheme." Oasis International Group, Oasis Management, and Satellite Holdings acted as "commodity pool operator[s]"—entities that solicited and received funds from investors. The three operators functioned under the common "Oasis" trade name, shared the same office and employees, maintained a shared website, and commingled their funds. The funds were held in the Oasis "commodity pools"—investment structures set up to manage the comingled funds. None of the Oasis corporate entities registered with the United States Commodity Futures Trading Commission, but the Oasis pools registered as financial services providers in New Zealand and Belize.

ATC Brokers, Ltd., provided brokerage services to the Oasis scheme. ATC Brokers is incorporated in England and Wales and is registered with the United Kingdom Financial Conduct Authority to conduct business involving forex trading. As a registered forex broker, ATC Brokers was required to conduct due diligence before onboarding potential traders. ATC Brokers's services allow licensed and approved foreign investment entities to trade on London markets on behalf of their underlying investor clients. ATC

Brokers also provides its clients with back-office software, licensed from Spotex LLC, to track account and trading information and to generate investment reports for investors. David Manoukian owns and serves as a director for ATC Brokers.

The Oasis commodity pools applied and were approved for two forex trading accounts with ATC Brokers. Manoukian personally approved the opening of the Oasis accounts, served as the primary representative handling the Oasis client relationship, and dealt directly with DaCorta and Anile from the start of the ATC Brokers relationship with Oasis. Oasis was one of ATC Brokers's biggest clients and generated "seven-figure" commissions and fees.

ATC Brokers provided liquidity for the Oasis pools to trade at 100:1 leverage, allowing Oasis to make dangerously high-risk bets. Oasis transferred almost $22 million of investor funds into its accounts, but "lost every penny traded at ATC in poor forex trading." By the time the scheme was halted, Oasis had accrued almost $20 million in losses and held only $2 million in cash—which had yet to be deployed in trading—in its brokerage accounts.

Spotex licensed financial software to ATC Brokers, which in turn licensed that software to Oasis. Spotex is also owned in part by Manoukian. The Spotex software allowed Oasis to keep online records of its account balances, forex trades, trading volumes, and investment income to be distributed to investors. Oasis also used the software to present investors, by web portal, with records of Oasis's purported investment returns. The investor-facing portal

and reports of profits were "central" to "attracting and keeping investors' funds."

Of course, because Oasis had no earnings, the records shown to investors were fraudulent. To conceal trading losses initially, an Oasis employee made manual "adjustments" to transform losses into reported gains on the investor-facing portal. Spotex, ATC Brokers, and Manoukian were informed of Oasis's losses and its concealment of them. Spotex monitored Oasis's actual trading activities on the back end, and a Spotex executive sent DaCorta hundreds of emails warning of margin calls, margin warnings, trading losses, excessive exposure, or excessive credit usage. ATC Brokers and Manoukian were copied on many of these warning emails.

As Oasis grew, manual adjustments became too cumbersome, so Oasis requested Spotex's assistance in automating the adjustments. In a July 2018 email, for example, Manoukian, on behalf of Oasis, asked Spotex to assist with the automation:

> They [Oasis] are able to see the spread from the [backend] account from the API and they are able to move it to the client account as a deposit. (currently doing it manually) . . .

> The goal is to be able to do the adjustment into the client account automatically via FIX or via an upload.

Spotex complied. It informed Manoukian that "[t]here is a report available in our web service called Margin Upload Request. Using this method, the adjustments can be uploaded for required accounts into our back-office." The Spotex program "assisted" and

"enabled" the automation of the adjustments, which facilitated Oasis's concealment at scale.

After the Oasis scheme was revealed, the Commission filed a civil action against the Ponzi corporate entities and individual perpetrators for a litany of fraud and disclosure violations. *CFTC v. Oasis Int'l Grp., Ltd.*, No. 8:19-cv-00886-VMC-SPF, ECF No. 110 (M.D. Fla. June 12, 2019). The Department of Justice also filed criminal actions against DaCorta and Anile, who were sentenced to 23- and 10-years' imprisonment, respectively. *See United States v. DaCorta*, No. 8:19-cr-00605-WFJ-CPT (R231) (M.D. Fla. Oct. 20, 2022); *United States v. Anile*, No. 8:19-cr-00334-MSS-CPT (R56) (M.D. Fla. Nov. 18, 2020).

The district court appointed Wiand as the receiver for the Oasis estate. Wiand was responsible for managing and recovering estate assets to distribute to the investor-victims. He filed an initial complaint against ATC Brokers, Spotex, and Manoukian. The defendants moved to dismiss, and Wiand amended his complaint.

The operative complaint asserts seven counts: aiding and abetting common-law fraud (count I); aiding and abetting common-law breaches of fiduciary duties (count II); fraudulent transfers in violation of the Florida Uniform Fraudulent Transfer Act, *see* FLA. STAT. §§ 726.105(1)(a), (1)(b); 726.106(1) (counts III, IV, V); gross negligence (count VI); and simple negligence (count VII). Wiand asserts the fraudulent-transfer claims in the amount of $21,925,000 against only ATC Brokers. He asserts the common-law tort claims against all defendants.

The defendants again moved to dismiss. Wiand opposed the motions and summarily requested leave to amend his complaint in his opposition memoranda to Manoukian's and ATC Brokers's motions. But he never filed a separate motion seeking leave to amend.

The district court dismissed Wiand's complaint with prejudice. It ruled that Wiand lacked standing to bring the tort claims against Manoukian because Oasis was not "separate and distinct from the intentional tortfeasors that controlled [it]." The district court also ruled that Wiand lacked standing to sue ATC Brokers. Finally, the district court ruled that Spotex was entitled to statutory immunity under the Communications Decency Act. Wiand appealed.

## II. STANDARDS OF REVIEW

We review *de novo* questions of standing, *Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 903 (11th Cir. 2022), and personal jurisdiction, *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021). We review for abuse of discretion the denial of leave to amend a complaint. *Thomas v. Farmville Mfg. Co.*, 705 F.2d 1307, 1307 (11th Cir. 1983).

## III. DISCUSSION

We proceed in three parts. First, we explain that Wiand has standing to maintain the fraudulent-transfer claims against ATC Brokers. Second, we explain that Wiand lacks standing to maintain the common-law tort claims. Third, we explain that the district court did not abuse its discretion in denying Wiand leave to amend his complaint.

*A. Wiand Has Standing to Maintain the Fraudulent-Transfer Claims.*

A federal equity receiver appointed in the wake of a Ponzi scheme stands in the shoes of the Ponzi estate. *See Isaiah*, 960 F.3d at 1306. The receiver has standing to complain about the injuries that the Ponzi entities suffered, *not* the injuries of the investor-victims. *Id.* ("[T]he receiver is not the class representative for creditors and cannot pursue claims owned directly by the creditors."); *see also Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995). So Wiand argues that he has standing to maintain the fraudulent-transfer claims against ATC Brokers because those transfers injured the Oasis corporate entities. We agree.

It is well-settled that a receiver for a Ponzi estate has standing to maintain fraudulent-transfer claims on behalf of the estate. *Isaiah*, 960 F.3d at 1306; *Wiand v. Lee*, 753 F.3d 1194, 1202–03 (11th Cir. 2014). At first glance, it might appear counterintuitive that the Oasis entities could complain that they were injured by fraudulent transfers they engineered. But we can understand that the corporate entities have suffered an injury, as Judge Posner explained in his canonical opinion, *Scholes v. Lehmann*, if we understand the entities as the "robotic tools" of the controlling perpetrators. 56 F.3d at 754. When the perpetrators are removed and a receiver is appointed in their place, the corporate structures are no longer the "evil zombies" of the perpetrator; they are "[f]reed from his spell" and regain standing to sue for the return of money fraudulently transferred. *Id.*

Like the majority of our sister circuits, we have adopted *Scholes* and "evil zombie" standing. We held that the "receiver of entities used to perpetrate a Ponzi scheme . . . h[as] standing to sue on behalf of the [entities] that were injured by the Ponzi scheme operator." *Lee*, 753 F.3d at 1202 (discussing *Scholes* and the Florida Act); *see also Isaiah*, 960 F.3d at 1306. After Oasis was freed from the control of DaCorta and his accomplices and Wiand was appointed in their place, Oasis regained standing to assert fraudulent-transfer claims.

The district court, without distinguishing between the tort and fraudulent-transfer claims, erroneously ruled that Wiand lacked standing to bring *any* claims against ATC Brokers. It relied on *Isaiah* to conclude that Wiand lacked standing to maintain *tort* claims against Manoukian, and then cross-referenced that analysis to conclude that Wiand also lacked standing to maintain common-law tort *and fraudulent-transfer* claims against ATC Brokers. But *Isaiah* expressly distinguishes between tort and fraudulent-transfer claims. 960 F.3d at 1306.

Ponzi receivers must meet additional criteria to have standing to maintain tort claims against third parties, as we will explain in Part III.C, but receivers may maintain fraudulent-transfer claims as a matter of course. ATC Brokers's argument that our decision in *Perlman* raised additional barriers to fraudulent-transfer standing is meritless. In *Perlman*, we affirmed the dismissal only of common-law tort claims; no fraudulent-transfer claims were at issue. *See* 38 F.4th at 902 (appeal concerned receiver's claims for "aiding and

abetting breach of fiduciary duty" and "aiding and abetting conversion").

ATC Brokers asserts that we may affirm the dismissal of the fraudulent-transfer claims on the alternative ground of lack of personal jurisdiction. But the district court declined to address the issue, and we ordinarily decline to consider issues not reached by the district court, *see, e.g.*, *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins.*, 40 F.4th 1295, 1306 (11th Cir. 2022) (declining to resolve personal jurisdiction question not reached by the district court). So we reverse the dismissal of the fraudulent-transfer claims against ATC Brokers and remand for further proceedings.

### B. Wiand Lacks Standing to Maintain the Tort Claims.

ATC Brokers, Manoukian, and Spotex argue that Wiand lacks standing to maintain his common-law claims for negligence and aiding and abetting. The district court dismissed those claims for lack of standing with respect to only Manoukian, but we must *sua sponte* address questions of standing for the claims against every defendant. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005). We hold that Wiand lacks standing to maintain common-law tort claims against any defendant.

*Isaiah* controls this issue. In *Isaiah*, a Florida Ponzi scheme deposited fraudulently raised funds with a particular bank. 960 F.3d at 1300–01. The receiver sought to sue the bank for willfully ignoring suspicious activity and alleged that the bank aided and abetted the Ponzi's conversion, fraud, and breach of fiduciary duty. *Id*. at 1301. But we explained that the *Isaiah* receiver "lack[ed] standing

to pursue such tort claims" because the Ponzi torts were "imputed" to the receiver. *Id*. at 1306; *see also Perlman*, 38 F.4th at 901 (affirming the dismissal of aiding and abetting claims under "Rule 12(b)(1) . . . for lack of subject matter jurisdiction" because "[receiver] Perlman lacked standing"). We also explained that tort and fraudulent-transfer claims must be treated differently for standing purposes: fraudulent transfers are "cleansed through receivership" as a matter of course, but common-law torts by third parties are not. *Isaiah*, 960 F.3d at 1306 (citation and internal quotation marks omitted). So receivers who assert common-law tort claims must meet a heightened standard to establish their standing.

The crux of the standing inquiry is whether the receivership estate—the Oasis corporate entity—was "separate and distinct" from the Ponzi scheme. *Id*.; *see also Perlman*, 38 F.4th at 901 ("Entities must have 'at least one innocent officer or director' and thus be 'honest corporations' for standing purposes." (quoting *Isaiah*, 960 F.3d at 1308)). If Oasis was an "honest corporation with rogue employees," the corporate entity can complain that it was injured by the torts of rogue insiders and their accomplices. *Isaiah*, 960 F.3d at 1307 (citation and internal quotation marks omitted). But if Oasis was "a sham corporation created as the centerpiece of a Ponzi scheme," the corporate entity could not have suffered any injury from its *own* fraudulent scheme, and Wiand, as receiver, lacks standing to maintain the tort claims. *Id*. (citation and internal quotation marks omitted)*; see also O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003) ("[A receivership estate] whose primary existence was as a perpetrator of the Ponzi scheme,

cannot be said to have suffered injury from the scheme it perpetrated.").

To establish that a receivership estate is separate and distinct from a Ponzi scheme, the receiver must allege the presence of innocent decision-makers within the corporation to whom fraudulent conduct could be reported. *Isaiah*, 960 F.3d at 1307. So if Wiand admits that Oasis was "wholly dominated by persons engaged in wrongdoing," and if his complaint is "devoid of any allegation" that Oasis "engaged in any legitimate activities," then Wiand lacks standing to bring any common-law tort claims. *Id.*

By Wiand's own telling, as alleged in his complaint, Oasis was a singular enterprise entirely controlled by fraudsters. The complaint alleges that those insiders "operated the Oasis Entities as a Ponzi scheme." DaCorta, Anile, and Montie, the former two of whom have been criminally convicted, "owned and controlled" Oasis International Group and served as its board of directors. The Oasis entities operated as "one common enterprise"—the complaint alleges that the corporate entities all operated under the common "Oasis" trade name, shared the same office, employees, and website, and comingled their funds. So Oasis was not an "honest corporation with rogue employees." *Perlman*, 38 F.4th at 904 (citation and internal quotation marks omitted). Instead, Oasis's "primary existence" before the receivership "was as a perpetrator of the Ponzi scheme." *Isaiah*, 960 F.3d at 1306 (quoting *O'Halloran*, 350 F.3d at 1203). Tellingly, the complaint does not allege that any of Oasis's controlling individuals were innocent. It instead relies on

the innocence of six shareholders, who owned less than 10 percent of Oasis International Group's common stock, and the innocence of the shareholders of the nonvoting preferred stock. But six duped minority shareholders, and nonvoting investors, do not amount to an innocent controlling decision-maker.

Wiand argues that he need only allege the existence of a *single* innocent and honest shareholder to defeat the conclusion that Oasis was a sham corporation without standing to assert a tort injury. But Wiand misstates the operative legal standard: the allegation of a single innocent shareholder is *necessary* but not *sufficient* to establish that Oasis was separate and distinct from the Ponzi perpetrators. *Isaiah* explains that a receiver lacks standing if he fails to allege that the Ponzi corporation "had at least one honest member of the board of directors or an innocent stockholder." *Id.* at 1307 (citation and internal quotation marks omitted). But the receiver still lacks standing when the now-receivership estate "was *controlled* exclusively by persons engaging in its fraudulent scheme." *Id.* (emphasis added) (citation and internal quotation marks omitted). So Wiand's assertion that there existed six innocent shareholders is not dispositive because he failed to allege that those shareholders exercised any decision-making power.

Because Wiand fails to allege that the Oasis corporate entities were separate and distinct from the Ponzi scheme, he cannot allege an injury to sustain his tort claims. Because standing is a threshold jurisdictional question, the district court was not empowered to reach any merits question. *Bochese*, 405 F.3d at 974. And ordinarily,

absent standing, "a court must dismiss the plaintiff's claim without prejudice." *McGee v. Solicitor Gen. of Richmond Cnty.*, 727 F.3d 1322, 1326 (11th Cir. 2013). The district court was not empowered to conclude that Spotex was immune under the Communications Decency Act, and it should have dismissed the tort claims without prejudice. We vacate the order dismissing the tort claims with prejudice and remand with instructions to dismiss without prejudice.

### C. The Denial of Leave to Amend Was Not an Abuse of Discretion.

The district court did not abuse it discretion in denying Wiand leave to amend his complaint a second time because he never properly moved for leave. A request for leave to amend must be made by motion "in writing unless made during a hearing or trial." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (quoting FED. R. CIV. P. 7(b)(1)). The motion must "set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (quoting *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999)) (internal quotation marks omitted). We explained in *Newton* that when "a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." 895 F.3d at 1277 (quoting *Cita*, 879 F.3d at 1157). Wiand did not file a separate motion for leave to amend, and his summary requests embedded in the memoranda in opposition to the motions to dismiss had no legal effect. The district court did not abuse its discretion in denying leave to amend.

## IV. CONCLUSION

We **REVERSE** the dismissal of Wiand's fraudulent-transfer claims and **REMAND** for further proceedings consistent with this opinion. We **VACATE** the dismissal of Wiand's common-law tort claims with prejudice and **REMAND** with instructions to dismiss the tort claims without prejudice.

22-13658                MARCUS, J., Concurring                    1

MARCUS, Circuit Judge, joined by WILLIAM PRYOR, Chief Judge, and JILL PRYOR, Circuit Judge, Concurring:

I join in full the Court's opinion and agree that our precedents compel the conclusion that Wiand lacked standing to bring his Florida common-law tort claims. Our caselaw is clear: a receiver "lacks standing to bring [tort] claims" on behalf of Ponzi corporations because "the fraudulent acts of the Receivership Entities, as the principals of the Ponzi scheme, are imputed to [the receiver] for purposes of his tort claims under Florida law." *Isaiah v. JPMorgan Chase Bank, N.A.*, 960 F.3d 1296, 1305 (11th Cir. 2020); *see also Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 901 (11th Cir. 2022) (explaining that this lack of standing is a matter of subject matter jurisdiction). I write separately to explain that I think this use of the term "standing" is mistaken. The better way to understand the defect in Wiand's tort claims is that a receiver does not have a cause of action under Florida's common law of tort to sue on behalf of Ponzi corporations.

The term "standing," used in its jurisdictional sense, refers to a court's power to hear a case. Federal courts are courts of limited jurisdiction and are "empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution or otherwise authorized by Congress." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994). "Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1273 (11th Cir. 2001). "[T]he

standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (emphasis omitted) (quotation marks and citation omitted). "Simply put, once a federal court determines that the plaintiff has no standing, the court is powerless to continue." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019) (alteration adopted) (quoting *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)). It must dismiss the claim rather than adjudicate the merits. *See Univ. of S. Ala.*, 168 F.3d at 410 ("[W]ithout jurisdiction we are powerless to consider the merits." (quoting *Wernick v. Mathews*, 524 F.2d 543, 545 (5th Cir. 1975)).

Yet, courts over the years have used jurisdictional terms in a loose fashion. "Courts -- including [the Supreme] Court -- have sometimes mischaracterized claim-processing rules or elements of a cause of action as jurisdictional limitations, particularly when that characterization was not central to the case, and thus did not require close analysis." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). The Supreme Court has "evince[d] a marked desire to curtail such 'drive-by jurisdictional rulings,' which too easily can miss the 'critical difference[s]' between true jurisdictional conditions and nonjurisdictional limitations on causes of action." *Id.* (citations omitted). "Attempting to clarify its meaning and to 'bring some discipline to the use of' the jurisdictional label, the [Supreme] Court has 'urged that a rule should not be referred to as

jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction.'" *Avila-Santoyo v. U.S. Att'y Gen.*, 713 F.3d 1357, 1359 (11th Cir. 2013) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).

In particular, the Supreme Court has walked back the concept of "prudential standing," which we have described as a "judicially self-imposed limit[] on the exercise of federal jurisdiction." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) (citation omitted); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014) (stating that "prudential standing" is an "inapt" label for many "concept[s] . . . previously classified as [such]"). "The Supreme Court's decision in [*Lexmark*] effectively abolished prudential standing (sometimes referred to as statutory standing) as a jurisdictional doctrine that would give rise to a Rule 12(b)(1) dismissal without prejudice." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018). In *Lexmark*, the Court explained that the term "prudential standing" is a "misnomer" as applied to the question of whether a "particular class of persons has a right to sue under [a particular] substantive statute." 572 U.S. at 127 (alteration adopted) (quotation marks and citation omitted). Rather, that question properly asks whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" under the statute -- in other words, whether the plaintiff "has a cause of action under the statute." *Id.* at 128. This is not a jurisdictional inquiry because "the absence of a valid . . . cause of action does not

implicate subject-matter jurisdiction." *Id.* at 128 n.4 (citation omitted); *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

"Much more than legal niceties are at stake here." *Steel Co.*, 523 U.S. at 101. A dismissal for failure to state a claim is a merits decision and is generally made with prejudice, barring the plaintiff from bringing the same suit again. *See* Fed. R. Civ. P. 41(b). A dismissal for lack of standing, on the other hand, is a non-merits decision and so is generally without prejudice and does not have any preclusive effect. *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam); *Hughes v. Lott*, 350 F.3d 1157, 1161 (11th Cir. 2003). Moreover, a court is obliged to raise jurisdictional issues sua sponte and must dispose of a case for lack of jurisdiction at any time, even after significant resources have been expended on the litigation. *Henderson*, 562 U.S. at 435. "[T]he consequences that attach to the jurisdictional label" are therefore "drastic." *Id.*

The rule in *Isaiah* is the type of mistaken jurisdictional holding the Supreme Court has eschewed. *Isaiah* reasoned that a Ponzi corporation did not have standing to sue for Florida common-law torts. 960 F.3d at 1305–07; *see also O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003) (reasoning, in dicta, that a bankrupt corporation, "whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated"); *Feltman v. Prudential Bache Secs.*, 122 B.R. 466, 474–75 (S.D. Fla. 1990) (expressing concern that

22-13658                    Marcus, J., Concurring                    5

if a bankruptcy trustee could bring common-law tort claims on behalf of a Ponzi corporation, the corporation's creditors would not be able to bring the same claims, and so concluding that the trustee lacked standing to bring those claims).

This rule does not really speak to the court's jurisdiction -- that is, the court's power to adjudicate the claim. For Article III purposes, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark*, 572 U.S. at 125 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). While *Isaiah* held that a Ponzi corporation "cannot be said to have suffered injury from the scheme it perpetrated," 960 F.3d at 1306 (citation omitted), this should not be understood to refer to Article III injury-in-fact. Indeed, to understand it in this light would eviscerate another holding of the *Isaiah* opinion: that a Ponzi corporation has standing to sue under Florida's Uniform Fraudulent Transfer Act (FUFTA). *Id.* at 1302 n.2. Specifically, we said that a Ponzi corporation is "harmed" when its "assets are transferred for an unauthorized purpose to the detriment of [its] defrauded investors," and that it has standing to sue to recover those assets under Florida statute. *Id.* at 1306 (citing *Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014)). A Ponzi corporation is therefore capable of suffering injury-in-fact sufficient to give it standing to sue, otherwise it could not bring these statutory claims. Yet, a Ponzi corporation cannot sue for Florida common-law tort claims.

Neither Florida's courts nor its legislature can decide whether a federal court has the power to adjudicate a claim. "From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies,' and the separation-of-powers principles underlying that limitation," the Supreme Court has "deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark*, 572 U.S. at 125 (quoting *Lujan*, 504 U.S. at 560). Thus, "[f]ederal law sets the parameters on what is necessary to possess Article III standing, and . . . state law can neither enlarge nor diminish those requirements." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 385 (2d Cir. 2021). The Florida legislature "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). So, the Florida legislature, in enacting FUFTA, did not create Article III standing for Ponzi corporations where there previously was none. A Ponzi corporation, like all other plaintiffs, must have Article III standing to sue for injuries sustained by the corporation. Nor can Florida's courts erect additional standing requirements to prevent a plaintiff with Article III standing from bringing a claim. *See Fund Liquidation Holdings*, 991 F.3d at 385. What Florida's common-law courts can and have done is rule that a Ponzi corporation does not have a cause of action for such Florida common-law torts as fraud, breach of fiduciary duty, or tortious interference with a business relationship.

Nor are the other theories supporting the *Isaiah* rule jurisdictional in nature. Sitting in diversity, we are *Erie*-bound to follow Florida law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). *Isaiah* followed the Florida case of *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. 2d DCA 2003). It was *Freeman*, after all, that "established the rule" cited in *Isaiah*. *Perlman*, 38 F.4th at 906 (Rosenbaum, J., dissenting) ("*Freeman* established the rule that a receiver acting on behalf of a former alter-ego corporation lacks standing to pursue claims against third parties who allegedly aided and abetted the former alter-ego corporation in its intentional torts."); *see generally Isaiah*, 960 F.3d at 1306–08 (citing extensively to *Freeman*). In addition to discussing injury, *Freeman*, 865 So. 2d at 552, Florida's Second District Court of Appeal was driven by what appear to be practical and equitable concerns. The court reasoned that it is not possible, where a corporation contains no honest member, "to separate the fraud and intentional torts of the insiders from those of the corporation itself" -- and that the corporate insiders would not be entitled to contribution for torts they themselves carried out. *Id*. at 551. Nor, the court continued, could third parties have a duty to disclose wrongdoing to a corporation with no innocent person to whom they could have made the disclosure. *Id*. at 552.

In fact, the *Freeman* court did not appear to consider its holding jurisdictional in nature. Rather than simply stating that the receiver lacked standing, the court somewhat obscurely titled this section of its opinion: "The receiver's remaining causes of action . . . suffer due to the nature of this Ponzi scheme." *Id*. at 550

(capitalization omitted). And, when stating its conclusion, the court used the term "standing" in quotation marks -- "[the receiver] has no 'standing' to bring these claims," *id.* at 553 -- suggesting that the court knew it was using the term in a loose sense, not in the jurisdictional sense. Moreover, in *Freeman*, the court dismissed the claims with prejudice, *id.*, as would be appropriate for a dismissal on the merits, not a dismissal for lack of subject matter jurisdiction. *See Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1470 (11th Cir. 1986) ("A dismissal with prejudice operates as a judgment on the merits unless the court specifies otherwise.").

The rule enunciated in *Freeman*, and followed by this Court in *Isaiah* and in *Perlman*, is better understood as a rule that Florida's courts will not recognize that a receiver has a cause of action to sue in common-law tort on behalf of a Ponzi corporation. Just as the question of whether a "particular class of persons has a right to sue under [a particular] substantive statute" is a question of whether that class of persons has a cause of action, *Lexmark*, 572 U.S. at 127–28, the same is true of a class of persons suing under a common-law tort. Just as Congress may create or remove statutory causes of action, state courts may create or remove state common-law causes of action. *See Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) ("Raising up causes of action where a statute has not created them [is] a proper function for common-law courts." (citation omitted)); *Gates v. Foley*, 247 So. 2d 40, 43 (Fla. 1971) (explaining that a state's common law of tort is "a field peculiarly nonstatutory," which can therefore be updated and altered by state courts). And Florida's Second District Court of Appeal in *Freeman* chose not

to allow a class of persons -- corporations used for Ponzi schemes -- to sue under Florida's common law of tort.  In other words, the problem with a receiver bringing common-law tort claims on behalf of a Ponzi corporation in Florida is not that a court lacks the power to adjudicate the claims, but that it chooses not to recognize them.  The receiver is without a cause of action precisely because the Florida courts have so ruled, not because the receiver lacks Article III standing, which is a different question the federal courts must answer.

Still, we have unambiguously characterized the rule that a receiver may not bring Florida common-law tort claims on behalf of a Ponzi corporation as jurisdictional.  In *Isaiah*, we said that a receiver in those circumstances lacked "standing."  960 F.3d at 1308.  It is not altogether clear whether *Isaiah* was using "standing" in a jurisdictional sense: in fact, the court affirmed the district court's Rule 12(b)(6) dismissal with prejudice, whereas a dismissal for lack of Article III standing should have been under Rule 12(b)(1) and without prejudice.  *See id.* at 1308 n.9, 1310.  But we then cited *Isaiah* in *Perlman* and expressly said that the issue was one of subject matter jurisdiction.  *Perlman*, 38 F.4th at 901; *see also O'Halloran*, 350 F.3d at 1202–04 (stating, in dicta, that a Ponzi corporation would not have "standing" to bring common-law tort claims for injuries resulting from the Ponzi scheme).  We did so without discussing why or how the issue was jurisdictional.

Of course, we remain bound by decisions we disagree with.  *See Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1231 (11th Cir.

2013); *see also United States v. Hough*, 803 F.3d 1181, 1197 (11th Cir. 2015) (Carnes, C.J., concurring) ("We are bound to follow prior panel precedent even if we disagree with it, but we are not bound to remain silent about whether it is wrong."). While the *Isaiah* rule would be better understood in terms of the lack of a cause of action, it has been articulated as one of standing in *Isaiah*, and specifically as one of jurisdictional standing in *Perlman*. Both of these cases remain good law and the Court's opinion has faithfully followed them. But, as I see it, it would be wiser to follow the Supreme Court's instruction to "bring some discipline" to the use of jurisdictional language, *Henderson*, 562 U.S. at 435, and to recognize that rules like this one do not constrain a court's power to hear a case, but rather reflect a state court's decision to police its own causes of action. *See Lexmark*, 572 U.S. at 127–28.